[No. S015131. Aug. 29, 1991.]

WALNUT CREEK MANOR et al., Plaintiffs and Appellants, v.
FAIR EMPLOYMENT AND HOUSING COMMISSION, Defendant and
Appellant.

248

COUNSEL

Capps, Staples, Ward, Hastings & Dodson, William H. Staples and Marsha L. Stephenson for Plaintiffs and Appellants.

John K. Van de Kamp and Daniel E. Lungren, Attorneys General, Andrea Sheridan Ordin, Chief Assistant Attorney General, Marian M. Johnston and M. Anne Jennings, Deputy Attorneys General, for Defendant and Appellant.

OPINION

PANELLI, J.—Pursuant to section 12987 of the California Fair Employment and Housing Act (Gov. Code, § 12900 et seq.) (the act), the Fair Employment and Housing Commission (the commission) is authorized to order a respondent who is found to have violated the housing provisions of the act to pay "punitive damages in an amount not to exceed one thousand dollars ($1,000) . . . and the payment of actual damages." (Gov. Code, § 12987, subd. (2).)[1] We granted review in this case to construe and determine the constitutionality of the damages provision of the act.

We conclude that while section 12987 authorizes the commission to award compensatory damages, an administrative award of compensatory damages for emotional distress violates the judicial powers clause of the California Constitution (art. VI, § 1; see *McHugh* v. *Santa Monica Rent Control Bd.* (1989) 49 Cal.3d 348 [261 Cal.Rptr. 318, 777 P.2d 91] [hereafter *McHugh*]). We further conclude, however, that the section is severable in its applications. We thus agree with the Court of Appeal that the emotional distress compensatory damages part of the award in this case must be stricken.

---

[1]All further statutory references are to the Government Code unless otherwise indicated.

Finally, we determine that pursuant to section 12987, the act authorizes only one punitive damages award against a respondent for a course of discriminatory conduct against the same individual on the same unlawful basis.

## I. FACTS

This case arises from a complaint for housing discrimination filed with the Fair Employment and Housing Department (the department) by Robert Cannon, an unmarried Black man, alleging that Walnut Creek Manor (Manor) had discriminated against him by refusing to rent him a one-bedroom apartment. Following an investigation, the department issued an accusation charging Manor, owner Marilyn Boswell, and rental manager Edith Indridson with violating section 12955, subdivisions (a) and (d) of the act by refusing to rent to Cannon on grounds of race and marital status. After a hearing before an administrative law judge (ALJ), the commission made the following findings of fact.

Manor is a 418-unit apartment complex. In November 1979, when Cannon first applied for a one-bedroom apartment, Manor was consistently full and had a waiting list. Cannon was told the waiting period was one to one and a half years and that he should check back every six months to see where he stood on the waiting list. For the ensuing two and one-half years Cannon called back approximately twice a year to determine his position on the waiting list.

In August 1981, more than one and a half years after Cannon first applied, Edith Indridson assumed the position of rental manager. At that time she believed Cannon had waited the normal time and "was thus ready to be rented to." Nevertheless, Indridson made no attempt to offer Cannon available one-bedroom apartments, but did call other non-Black applicants who had applied after Cannon.

Following her first meeting with Cannon in November 1981, Indridson marked his name with the code designation Manor used for undesirable tenants, but after the department commenced its investigation in June of 1982, she altered the code rating to desirable. In April 1982 Cannon was first on the waiting list, but when he visited the rental office on April 5, Indridson refused to tell him where he stood. After this encounter, Indridson wrote owner Marilyn Boswell for advice on how to treat Cannon. In response, Boswell sent Indridson a copy of an October 9, 1980, opinion letter written by her attorney after a race discrimination complaint was filed against Phoenix Manor, a housing development Boswell owned in Arizona. The

letter recommended that applicants be required to fill out a questionnaire on their interests and activities and that the rental agents be instructed to look to the questionnaire information for "other, nondiscriminatory reasons" for refusing to rent to "undesired" applicants. After receiving the letter, Indridson asked Cannon to fill out a questionnaire, although she made no similar request of anyone else then on the waiting list. After Cannon had completed the questionnaire, Indridson told him she did not have any rentals available.

In May 1982, while checking the availability of mobilehomes for rent at a Contra Costa County mobilehome park, Cannon met a non-Black man who told Cannon he had applied to Manor a few months before and had moved in the same month. The next day Cannon called Manor and again asked where he stood on the waiting list. Indridson refused to tell him. On the following Wednesday, Indridson's day off, Cannon called Manor without identifying himself and asked how long the waiting list was. He was told the list was one year long and was encouraged to apply. Cannon thereupon filed his complaint with the department.

From November 1981 until June 28, 1982, the date of Cannon's complaint, Indridson rented 18 apartments to later, non-Black applicants. Eleven of these were rented between March and June; of these, three were rented to married couples. From June 1982 to July 1983, Indridson rented another 24 one-bedroom apartments to later, non-Black applicants.

The ALJ found Cannon's claim of racial discrimination meritorious and awarded Cannon $1,500 in unspecified compensatory damages and $650 in punitive damages assessed against rental manager Edith Indridson. The commission did not adopt the ALJ's proposed decision; rather, after considering additional written argument, the commission found that Cannon had been discriminated against on the basis of marital status as well as race. The commission awarded Cannon special damages for the cost of his rent and utilities in excess of what he would have paid at Manor, $162.50 in attorney fees, and $50,000 in compensatory damages for emotional distress. In addition, the commission awarded Cannon $40,635 in punitive damages (calculated at $1,000 for each of 35 apartment rentals made to others while his application was pending and within the 120-day jurisdictional time period [§ 12980] from February 28, 1982, forward, as adjusted, plus interest). The commission determined that Manor, owner Marilyn Boswell, and rental manager Indridson were jointly and severally liable for the punitive damage award. Finally, the commission issued a cease and desist order and ordered affirmative relief, which required Manor to offer Cannon the first

available one-bedroom apartment, post certain notices, and conduct training sessions for employees to educate them about housing discrimination law.

On petition for writ of administrative mandamus (Code Civ. Proc., § 1094.5), the trial court remanded the case to the commission with directions to reconsider the finding of marital status discrimination and limit punitive damages to $1,000, as adjusted. All parties appealed.

The Court of Appeal affirmed in part and reversed in part. The Court of Appeal interpreted the statute as authorizing the commission to award unlimited compensatory damages for housing discrimination. The court held, however, that while the commission's award of special damages was valid, the award of general compensatory damages for emotional distress constituted an unconstitutional exercise of judicial power by a nonjudicial body in violation of the judicial powers clause of the California Constitution (art. VI, § 1) (hereafter article VI, section 1 or the judicial powers clause).[2] The Court of Appeal thus determined that the $50,000 compensatory damage award for emotional distress should be stricken.

The Court of Appeal reversed the trial court's ruling that the statute limits the punitive damages award against Manor, Boswell and Indridson to a total of $1,000. The Court of Appeal held that section 12987 authorizes the commission to order a separate award of punitive damages for each act of discrimination within the jurisdictional period. The court determined, however, that as to Indridson the $40,635 punitive damages award was excessive as a matter of law, because the amount exceeded 80 percent of her net worth of $50,000. (*Storage Services* v. *Oosterbaan* (1989) 214 Cal.App.3d 498, 514-516 [262 Cal.Rptr. 689].) The court directed that the punitive damages award be remanded to the commission for determination of whether each of the 35 rentals to later non-Black applicants was the rental of a one-bedroom apartment to one person (rather than a couple), and for reconsideration, in light of her net worth, of Indridson's liability for such punitive damages as the commission should find appropriate.

The commission and respondents Manor, Boswell and Indridson each petitioned for review.[3]

---

[2]The Court of Appeal found it unnecessary to reach Manor's claims that the award of compensatory damages also violated article III, section 3 (separation of powers clause) and article I, section 16 (jury trial clause) of the California Constitution and the Sixth and Seventh Amendments (jury trial) to the United States Constitution.

[3]The parties do not seek review of the Court of Appeal's determination that substantial evidence supported the commission's factual findings, and that the trial court, although choosing to apply the independent judgment test, could properly have applied the substantial evidence standard of review. The parties likewise do not challenge the commission's deter-

## II. DISCUSSION

### A. *The Award of Actual Damages*

Section 12987 authorizes the commission to order a respondent who has violated the housing provisions of the act to pay "actual damages." ■ Neither party disputes that the term "actual damages" as used in section 12987 means compensatory damages, and the Court of Appeal so held. This conclusion follows from the legal as well as the common and usual meaning of the term. (See 22 Am.Jur.2d (rev.) Damages, § 24, p. 50; Oleck, Damages to Person and Property (rev. ed. 1961) § 12, p. 22 [hereafter Oleck]; see also Webster's New Internat. Dict. (2d ed. 1958) p. 27, col. 3 [defining "actual" as "[e]xisting in act or reality; . . . in fact; real;—opposed to . . . speculative"].) Although most cases construing the term have done so in the context of a judicial rather than an administrative proceeding, nothing in the history of the act suggests that in authorizing the commission to award actual damages the Legislature intended the phrase to be construed differently than it is understood in the law of damages. (Cf. *Morehead* v. *Lewis* (N.D.Ill. 1977) 432 F.Supp. 674, 678 [construing the federal fair housing act].) The inference, rather, is to the contrary.[4] ■ Consequently, like the parties, we take no issue with the Court of Appeal's determination that the phrase "actual damages" as used in section 12987 means compensatory damages, or that compensatory damages include nonquantifiable general damages for emotional distress and pecuniarily measurable special damages for out-of-pocket losses. (See *Hess* v. *Fair Employment and Housing Com.* (1982) 138 Cal.App.3d 232, 237 [187 Cal.Rptr. 712, 33 A.L.R.4th 958]; *Weider* v. *Hoffman* (M.D.Pa. 1965) 238 F.Supp. 437, 445 [citing 25 C.J.S., Damages, § 2]; see also Oleck, *supra*, § 12, at pp. 22-23, § 80, at pp. 59-60; 22 Am.Jur.2d, *supra*, § 23, at p. 50, § 28, at p. 56.)

■ We turn, then, to the question whether an administrative award of general, as opposed to special, compensatory damages violates the judicial

---

mination that Manor and Boswell are liable, as principals, for Indridson's unlawful discrimination.

[4]The phrase "actual damages," first added to the act in 1977, evidently derives from title VIII of the federal Civil Rights Act of 1968 (act of Apr. 11, 1968, tit. VIII, § 812, Pub.L. No. 90-284, 82 Stat. 88), relating to housing discrimination, which specified that a court could award "actual damages and not more than $1,000 punitive damages" (see former 42 U.S.C. § 3612(c)). The term "actual damages" as used in the federal statute has been construed to be a synonym for compensatory damages. (*Steele* v. *Title Realty Company* (10th Cir. 1973) 478 F.2d 380, 384; *Morehead* v. *Lewis, supra*, 432 F.Supp. 674, 678; see also *Curtis* v. *Loether* (1974) 415 U.S. 189, 195-197 [39 L.Ed.2d 260, 266-268, 94 S.Ct. 1005].) The term as used in the Unruh Civil Rights Act (Civ. Code, § 52, subd. (a)) has been likewise construed. (See *Greenberg* v. *Western Turf Assn.* (1903) 140 Cal. 357, 360, 363 [73 P. 1050] [construing § 2 of the 1893 act, Stats. 1893, ch. CLXXXV, p. 220].)

powers clause. In resolving this issue, we look for guidance to our recent decision in *McHugh, supra,* 49 Cal.3d 348.

In *McHugh* we considered whether a local charter amendment authorizing administrative adjudication of excess rent claims and imposition of treble damages was unconstitutional as in violation of article VI, section 1. ▮ Reiterating the principle that "[a]gencies not vested by the Constitution with judicial powers may not exercise such powers" (49 Cal.3d at p. 356), we there articulated the following standard: "An administrative agency may constitutionally hold hearings, determine facts, apply the law to those facts, and order relief—including certain types of monetary relief—so long as (i) such activities are authorized by statute or legislation and are *reasonably necessary* to effectuate the administrative agency's *primary, legitimate regulatory purposes,* and (ii) *the 'essential' judicial power* (i.e., the power to make enforceable, binding judgments) *remains ultimately in the courts, through review of agency determinations.*" (49 Cal.3d at p. 372, italics in original.) The agency, we emphasized, may exercise *"only those powers that are reasonably necessary to effectuate [its] primary, legitimate regulatory purposes."* (*Ibid.,* italics in original.)

Although in *McHugh* we reserved the question now before us—i.e., whether an administrative agency's award of general compensatory damages violates the judicial powers clause (49 Cal.3d at p. 375, fn. 38), we clearly set out the approach for resolving the issue. In applying the first or substantive prong of the standard, i.e., the "reasonable necessity/legitimate regulatory purpose" requirements, we first inquire whether the award is authorized by legislation, and is "reasonably necessary to accomplish the administrative agency's regulatory purposes." (49 Cal.3d at p. 374.) Next, we must "closely scrutinize the agency's asserted regulatory purposes in order to ascertain whether the challenged remedial power is merely incidental to a proper, primary regulatory purpose, or whether it is in reality an attempt to transfer determination of traditional common law claims from the courts to a specialized agency whose primary purpose is the processing of such claims." (*Ibid.*)

▮ The commission argues that where the Legislature has clearly authorized an administrative agency to award monetary relief, we should not substitute our judgment for the legislative decision that such authority is reasonably necessary to effectuate the agency's regulatory purposes; rather, pursuant to due process principles, our only inquiry should be whether the remedy is procedurally fair and related to a proper legislative goal. (See, e.g., *Hale* v. *Morgan* (1978) 22 Cal.3d 388, 398 [149 Cal.Rptr. 375, 584 P.2d 512].) Here, the commission argues, the Legislature has clearly authorized it

to award actual damages, the eradication of discrimination in housing is a legitimate regulatory purpose, and general damages limited to remedying the effects of the unlawful discriminatory conduct serve to effectuate the purposes of the act.

Whatever merit the commission's argument may have in the context of a due process analysis, in applying the judicial powers doctrine our role is not so limited. ■ *McHugh* clearly contemplated that the mere fact of legislative authorization does not shield a challenged power from scrutiny under the reasonable necessity/legitimate regulatory purpose prong of the substantive test. This much is clear from *McHugh, supra,* 49 Cal.3d at pages 378-379, where the court conceded treble damages were authorized by the city charter, yet found such damages violative of the reasonable necessity/ legitimate purpose prong, in part because, in the court's view, there were other, less intrusive means of accomplishing the asserted regulatory goal. It is thus apparent from *McHugh* that our judicial powers analysis contemplates a somewhat higher level of scrutiny than rational basis.

The purposes of the housing provisions of the act are to prevent and eliminate specified discriminatory practices in the sale or rental of housing. (See §§ 12920 [housing discrimination against public policy], 12955 [unlawful practices], 12980 [procedure for prevention and elimination of housing discrimination]; cf. *Peralta Community College Dist.* v. *Fair Employment and Housing Com.* (1990) 52 Cal.3d 40, 48 [276 Cal.Rptr. 114, 801 P.2d 357] (hereafter *Peralta*) [employment provisions].) To this end, the act authorizes any person claiming to be the victim of unlawful discrimination to file a verified complaint with the department, and authorizes the department, after preliminary investigation, to seek to resolve the complaint by conference, conciliation and persuasion. If that fails or is unwarranted, the director may issue an accusation to be heard by the commission. (§§ 12980, subds. (a), (c), 12981.) Pending resolution of the complaint, the department may in appropriate cases seek an injunction preventing the owner of the property from taking any further action with respect to its rental, lease or sale. (§ 12983.) If, after hearing, the commission finds the respondent has engaged in an unlawful practice, it shall issue a cease and desist order and, in addition, may order the respondent to offer the complainant the same or a like housing accommodation, the payment of punitive damages not to exceed $1,000, the payment of actual damages, and affirmative or prospective relief. (§ 12987.)

If, by contrast, the department fails to issue an accusation within 150 days after the filing of a complaint, or earlier determines none will issue, the department issues a right-to-sue letter, notifying the complainant of the right

to bring a civil action in court. (§ 12980, subd. (d).) Although the act expressly provides that the filing of a complaint and pursuit of conciliation or remedy under the act will not prejudice the complainant's right to pursue judicial relief under other applicable laws, it further provides (1) that if a civil suit has been filed under the Unruh Civil Rights Act (Civ. Code, § 51 et seq.), the department must terminate proceedings on notification of the entry of final judgment unless the judgment is a dismissal entered at the complainant's request (§ 12980, subd. (a)), and (2) that no remedy shall be available under the act unless the complainant waives all rights or claims under section 52 of the Civil Code[5] before receiving a remedy (§ 12987, subd. (3)).

■ Seeking to satisfy the substantive test, the commission argues that the award of general compensatory damages is necessary to effectuate the purpose of the act to provide "effective remedies" that will eliminate discriminatory practices (see § 12920). The awarding of damages for the pain and humiliation of race-based discrimination, the commission asserts, helps to eliminate such practices by serving as a deterrent and, in addition, serves to make the aggrieved person whole by compensating for the denial of the right to be free from discrimination in housing (citing *Memphis Community School Dist.* v. *Stachura* (1986) 477 U.S. 299, 307 [91 L.Ed.2d 249, 258-259, 106 S.Ct. 2537]; *Kentucky Com'n on Human Rights* v. *Fraser* (Ky. 1981) 625 S.W.2d 852).

That compensatory damages serve to deter discrimination and compensate its victim for the psychic harm flowing from discrimination is not in dispute, nor is it the issue. Under *McHugh, supra,* 44 Cal.3d 348, the issue, rather, is whether the award of substantial emotional distress compensatory damages is "reasonably necessary" to accomplish the commission's legitimate regu-

---

[5]Civil Code section 52 provides in pertinent part: "(a) Whoever denies, . . . or whoever makes any discrimination, distinction or restriction on account of sex, color, race, religion, ancestry, national origin, or blindness or other physical disability contrary to the provisions of Section 51 [guaranteeing equal accommodations in business establishments] or 51.5 [prohibiting discrimination by business establishments], is liable for each and every such offense for the actual damages, and such amount as may be determined by a jury, or a court sitting without a jury, up to a maximum of three times the amount of actual damage but in no case less than two hundred fifty dollars ($250), and such attorney's fees as may be determined by the court in addition thereto, suffered by any person denied the rights provided in Section 51 or 51.5. [¶] . . . [¶] (f) Any person claiming to be aggrieved by an alleged unlawful practice in violation of Section 51 or 51.7 [right to freedom from violence or intimidation on grounds of race, sex, etc.] may also file a verified complaint with the Department of Fair Employment and Housing pursuant to Section 12948 of the Government Code."

For an extensive discussion of the interrelationship between the Unruh Civil Rights Act (Civ. Code, § 51 et seq.) and the housing provisions of the act, see *Dept. Fair Empl. & Hous.* v. *Carefree Ranch Mobile Home Park* (1984) No. 84-31, FEHC Precedential Decisions 1984-1985, CEB 12, pages 5-16.

latory purposes and "merely incidental" to its primary regulatory purposes, or in reality transfers to the agency the judicial function of determining traditional common law claims. (*Id.* at p. 374.)

In answering this question, we find it helpful to trace the history of the fair housing provisions of the act. In 1959 the Legislature enacted three separate acts directed to the declaration and enforcement of civil rights: the Fair Employment Practices Act (FEPA) (former Lab. Code, § 1410 et seq.; see Stats. 1959, ch. 121, § 1, pp. 1999-2005), prohibiting employment discrimination; the Hawkins Act (former Health & Saf. Code, § 35700 et seq., enacted by Stats. 1959, ch. 1681, § 1, pp. 4074-4077), prohibiting discrimination in publicly assisted housing accommodations; and the Unruh Civil Rights Act (Civ. Code, §§ 51-52, added by Stats. 1959, ch. 1866, §§ 1-4, p. 4424, replacing former Civ. Code, §§ 51-54, added by Stats. 1905, ch. 413, §§ 1-4, pp. 553-554), prohibiting discrimination in business establishments.[6] (*Dyna-Med, supra,* 43 Cal.3d at p. 1394.)

Originally the Legislature intended only employment discrimination to be handled administratively; discrimination in housing was to be handled by civil suit under the Hawkins and Unruh Civil Rights Acts. (*Stearns v. Fair Employment Practice Com.* (1971) 6 Cal.3d 205, 214 [98 Cal.Rptr. 467, 490 P.2d 1155] (hereafter *Stearns*); see *Burks v. Poppy Construction Co., supra,* 57 Cal.2d 463.) However, because civil damages in housing violations often amounted to less than $1,000 (*Stearns, supra*), defendants by means of various procedural maneuvers could force the cost of litigation above the plaintiff's expected recovery. To remedy this, the Legislature in 1963 replaced the Hawkins Act with the Rumford Fair Housing Act (former Health & Saf. Code, § 35700 et seq., enacted by Stats. 1963, ch. 1853, §§ 2-4, pp. 3823-3830), which extended the housing discrimination prohibitions to housing generally and for the first time afforded an administrative remedy for housing discrimination. (*Stearns, supra,* 6 Cal.3d at p. 214; see *Dyna-Med, supra,* 43 Cal.3d at p. 1394; see also 56 Ops.Cal.Atty.Gen. 332, 336 (1973).)[7]

---

[6]Whereas the FEPA provided for administrative relief and made no mention of damages, the Hawkins and Unruh Civil Rights Acts provided for judicial relief and authorized the award of damages. The Hawkins Act permitted complainants to sue for both equitable relief and damages in an amount not less than $500; the Unruh Civil Rights Act authorized the award of "actual damages" plus $250. (*Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1394 & fn. 16 [241 Cal.Rptr. 67, 743 P.2d 1323] (hereafter *Dyna-Med*); *Burks v. Poppy Construction Co.* (1962) 57 Cal.2d 463, 470 [20 Cal.Rptr. 609, 370 P.2d 313].)

[7]In addition to authorizing administrative remedies for particular acts of discrimination, the Rumford Fair Housing Act authorized the administrative agency to take steps to prevent

Although the Rumford Fair Housing Act retained language authorizing the award of "damages," it transformed the statutory minimum recoverable in judicial proceedings under the Hawkins Act (see fn. 6, *ante*) into a statutory maximum in administrative proceedings. Thus, the Rumford Act initially empowered the commission's predecessor, the Fair Employment Practice Commission (FEPC), if it determined that specified make-whole remedies were not available, to award damages in an amount not to exceed $500. (Stats. 1963, ch. 1853, § 2, pp. 3828-3829.)[8] In 1975 the maximum damage award was increased to $1,000. (Stats. 1975, ch. 280, § 1, p. 701.) In 1977 the Rumford Act was amended to specify that the damages payable to the injured party were "actual and punitive" damages and for the first time to describe the FEPC's authority to award damages in housing cases as cumulative, rather than alternative. (Stats. 1977, ch. 1187, § 10, p. 3893; Stats. 1977, ch. 1188, § 13.1, pp. 3905-3906 [describing the FEPC's authority as "including, but not limited to," the actions specified].) (See *Dyna-Med, supra*, 43 Cal.3d at p. 1394 & fn. 17.) At the same time, the Legislature extended to victims of housing discrimination the right to bring a civil suit under the act on receipt from the department of a right-to-sue letter. (Stats. 1977, ch. 1188, § 5.1, p. 3902; see § 12980, subd. (d).)

In 1980 the Legislature combined the employment and housing antidiscrimination statutory schemes to form the present act, with enforcement of both sections of the act vested in the commission. (Stats. 1980, ch. 992, § 4, pp. 3140-3142; see *Dyna-Med, supra*, 43 Cal.3d at p. 1394.) In 1981 section 12987 was amended to remove the limit on the amount of actual damages, while retaining a $1,000 limit on punitive damages. (§ 12987, subd. (2), as amended by Stats. 1981, ch. 899, § 3, p. 3424.)

As this history illustrates, from 1963, when the FEPC was first empowered to handle housing discrimination complaints, until 1982, when the amendment removing the cap on actual damages became effective, the agency's primary remedial focus was on cease and desist orders and affirmative equitable or corrective "make-whole" relief that would provide a

violations of the housing antidiscrimination statutes, e.g., to promulgate rules, receive complaints, conduct hearings and investigations, create advisory agencies and councils, and issue reports. (Former Health & Saf. Code, § 35730.5; *Stearns, supra*, 6 Cal.3d at p. 214, fn. 8; see now §§ 12930, 12935.)

[8]As originally enacted the Rumford Fair Housing Act provided in pertinent part: "If the commission finds that a respondent has engaged in any unlawful practice as defined in this part, the commission shall . . . issue . . . an order requiring [the] respondent to cease and desist from such practice and to take *one* of the following *affirmative* actions, as, in the judgment of the commission, will effectuate the purpose of this part: [¶] (1) The sale or rental of the housing accommodation to the aggrieved person, if it is still available. [¶] (2) The sale or rental of a like accommodation, if one is available, or the next vacancy in a like accommodation. [¶] (3) The payment of damages to the aggrieved person in any amount not to exceed five hundred dollars ($500), *if the commission determines that neither of the remedies under (1) or (2) is available.*" (Former Health & Saf. Code, § 35738, italics added.)

victim of housing discrimination with the subject housing or housing substantially similar thereto. The award of damages was authorized in only limited and minimal amounts. Indeed, from its enactment in 1963 until its amendment in 1977, the Rumford Fair Housing Act authorized the FEPC to award monetary damages *only* if the specified make-whole remedies were not available; not until 1977 did the award of even minimal damages become a cumulative remedy.

The statutory focus on corrective measures was consistent with the legislative purpose to provide a streamlined procedure to prevent and eliminate housing discrimination. As explained in *Stearns, supra*: "In providing an administrative remedy for housing discrimination the Legislature undertook to make sure that individual actions did not become burdened with procedural technicalities. [¶] To achieve this end the FEPC established procedures that are as simple and uncomplicated as possible. Complaints are drafted by laymen; the commission informally attempts to eliminate discriminatory practices before instituting formal accusations; the commission, on a finding of discrimination, may fashion remedies both to correct unique cases of such practice as well as to curb its general incidence." (6 Cal.3d at p. 214.)

 ▬ ██ Until 1982, therefore, the award of damages—in a minimal and limited amount—was clearly incidental to the commission's primary regulatory purpose of correcting and preventing housing discrimination.[9] The legislative history does not disclose the reason for the Legislature's amendment of the act to eliminate the ceiling on actual damages. Since the amendment, however, the dollar amounts of the damage awards have steadily risen[10] and may be expected to continue to do so. The availability of unlimited damages thus risks converting the focus of the commission's remedial decision from one of fashioning equitable remedies directed to making the injured party whole in the context of housing, to one of compensating him or her for the psychic harm suffered. As the commission seeks to assess and evaluate the extent of the complainant's injury, what once was an alternative or incidental adjunct to the primary relief of securing the same or comparable housing, has assumed an independent importance

---

[9]"Incidental" is defined in part as "Depending upon or appertaining to something else as primary; . . . something incidental to the main purpose" (Black's Law Dict. (6th ed. 1990) p. 762, col. 1); "not of prime concern; subordinate" (Webster's New Internat. Dict., *supra*, at p. 1257, col. 1).

[10]In the instant case, as noted, the Commission rejected the ALJ's award of $1,500 and awarded the complainant $50,000 in compensatory damages. Commission awards have reached $100,000. (E.g., *Dept. Fair Empl. & Hous.* v. *Davis Realty Co.* (1987) No. 87-02, FEHC Precedential Decs. 1986-1987, CEB 5 [out-of-pocket losses plus $95,000 emotional distress damages for four victims].)

that potentially threatens to dominate the administrative hearing. (See, e.g., *Dept. Fair Empl. & Hous.* v. *Aluminum Precision Products, Inc.* (1988) No. 88-05, FEHC Precedential Decs. 1988-1989, CEB 4, p. 11 [reciting the numerous factors the commission considers in awarding compensatory damages and the relevant expert and percipient witnesses]; *Dept. Fair Empl. & Hous.* v. *Davis Realty Co., supra,* FEHC Dec. No. 87-02, CEB 5 [five pages of findings devoted to the emotional impact of the discrimination on the four complainants, each of whom, at the department's behest, was examined by a psychologist].)

■ As we recognized in *Youst* v. *Longo* (1987) 43 Cal.3d 64, 80 [233 Cal.Rptr. 294, 729 P.2d 728, 85 A.L.R.4th 1025]: "[T]he power to award compensatory and punitive tort damages to an injured party is a judicial function." (Accord, *Curtis* v. *Loether, supra,* 415 U.S. at p. 196 [39 L.Ed.2d at pp. 267-268]; see also *Broward County* v. *La Rosa* (Fla. 1987) 505 So.2d 422, 423-424 [where the court stated that it could not "imagine a more purely judicial function than a contested adjudicatory proceeding involving disputed facts that results in an award of unliquidated common law damages for personal injuries in the form of humiliation and embarrassment"].)

Although in *McHugh, supra,* 49 Cal.3d 348, we rejected a rigid rule that would hold administrative agencies incompetent under the doctrine of judicial powers to award "damages" of any kind (*id.* at p. 358), in upholding the administrative award of damages we repeatedly distinguished incidental, "restitutive" damages—permissible under the judicial powers clause—from the award of unlimited, nonquantifiable compensatory damages, as to which we reserved opinion. (See, e.g., *id.* at pp. 358, 359-360, 375 & fn. 38.) In *Curtis* v. *Loether, supra,* 415 U.S. 189, a title VIII housing discrimination case, the United States Supreme Court made a similar distinction. Referring to the plaintiff's complaint, the Supreme Court stated, "[T]he relief sought here—actual and punitive damages—is the traditional form of relief offered in the courts of law. [Fn. omitted.]" (415 U.S. at p. 196 [39 L.Ed.2d at p. 267].) Backpay, by contrast—the only monetary relief afforded under title VII for employment discrimination—"is an integral part of an equitable remedy, a form of restitution." (*Id.* at p. 197 [39 L.Ed.2d at p. 197] [explaining why the jury trial right applies to a title VIII, but not a title VII, civil suit].)[11]

---

[11]In 1988 title VIII was amended by the Fair Housing Amendments Act to permit for the first time the administrative award of "actual damages" and up to $50,000 in civil monetary penalties for violations of the federal fair housing act. (42 U.S.C. § 3612(g)(3).) The 1988 Fair Housing Amendments Act contains a judicial option, so that any party who desires a jury trial may remove the case to federal court and there demand a jury. (42 U.S.C. § 3612(a), (o); see generally Schwemm, Housing Discrimination: Law and Litigation (1990) ch. 24, §§ (3610-3612: *Complaints to HUD.*)

Although in *McHugh* we did not expressly define "restitutive damages," both in context and common parlance the meaning of the phrase seems clear. ██ "Restitutive," relates to restitution: "of the nature of, or tending to, restitution." (Webster's New Internat. Dict., *supra,* at p. 2125, col. 1.)" "Restitution," in turn, is "the act of making good, or of giving an equivalent for, loss . . . ." (*Ibid.*; see also Black's Law Dict., *supra,* at p. 1313, col. 2; *Curtis* v. *Loether, supra,* 415 U.S. at p. 197 [39 L.Ed.2d at p. 268].) Applying the stated guidelines, in *McHugh* we upheld the authority of a local rent control board to adjudicate excess rent claims and to order repayment of the excess amounts collected (49 Cal.3d at p. 375). In so doing we disapproved *Jersey Maid Milk Products Co.* v. *Brock* (1939) 13 Cal.2d 620 [91 P.2d 577], which found unconstitutional a statutory provision that authorized the Director of Agriculture to resolve wholesale milk price disputes and to award milk producers such amounts as he determined the distributors had wrongfully refused to pay. (49 Cal.3d at pp. 356-358.)

By implication, therefore, restitutive damages encompass, at a minimum, quantifiable sums that one private party subject to the jurisdiction of the agency owes to another party who claims the sum was obtained, or not paid, in violation of a law or regulation the agency is empowered to enforce. To the foregoing we would add, as here, out-of-pocket expenditures incurred or economic harm suffered by one party in consequence of another party's violation of a law or regulation the agency is empowered to enforce. Restitutive damages, in short, are akin to special damages, i.e., they are quantifiable amounts of money due an injured private party from another party to compensate for the pecuniary loss directly resulting from the second party's violation of law.

██ General compensatory damages for emotional distress, by contrast, are not pecuniarily measurable, defy a fixed rule of quantification, and are awarded without proof of pecuniary loss. (Oleck, *supra,* § 46, at pp. 31-32; 22 Am.Jur.2d, Damages, *supra,* § 28, at p. 56.) As the commission itself has recognized, in seeking to place a dollar value on a complainant's mental and emotional injuries there is little in legal authority to guide it, for the reason that "[i]t has traditionally been left to the trier of fact to assess the degree of harm suffered and to fix a monetary amount as just compensation therefor. [Citation.]" (*Dept. Fair Empl. & Hous.* v. *Ambylou Enterprises* (1982) No. 82-06, FEHC Precedential Decs. 1982-1983, CEB 3, p. 11 [employment discrimination]; see *Peralta, supra,* 52 Cal.3d at p. 56; see generally Schwemm, *Compensatory Damages in Federal Fair Housing Cases* (1981) 16 Harv. C.R.-C.L. L.Rev. 83 [discussing the difficulty of evaluating intangible injuries in housing discrimination cases] [hereafter Schwemm].)

Contrasting general compensatory damages with the equitable remedy of restitution, the court in *Dean Witter Reynolds, Inc.* v. *Superior Court* (1989) 211 Cal.App.3d 758, 774 [259 Cal.Rptr. 789], made the following apt observation in concluding that general compensatory damages are not available under the unfair competition statute (Bus. & Prof. Code, § 17200 et seq.): "The exclusion of claims for compensatory damages is . . . consistent with the overarching legislative concern to provide a *streamlined* procedure for the prevention of ongoing or threatened acts of unfair competition. To permit individual claims for compensatory damages to be pursued as part of such a procedure would tend to thwart this objective by requiring the court to deal with a variety of damage issues of a higher order of complexity." (Italics in original.)

The same, we believe, holds true for the administrative adjudication of nonquantifiable emotional distress damages in housing discrimination cases. As shown, the purpose of the act was to provide a streamlined and economic procedure for preventing and redressing discrimination in housing as an alternative to the more cumbersome and costly procedure of a civil suit. The availability of alternate civil remedies underscores that the primary regulatory purpose of the act is to *prevent* discrimination in housing before it happens and, when it does occur, to offer a streamlined and economical administrative procedure to make its victim whole *in the context of the housing* (cf. *Dyna-Med, supra,* 43 Cal.3d at p. 1387). The award of unlimited general compensatory damages is neither necessary to this purpose nor merely incidental thereto; its effect, rather, is to shift the remedial focus of the administrative hearing from affirmative actions designed to redress the particular instance of unlawful housing discrimination and prevent its recurrence, to compensating the injured party not just for the tangible detriment to his or her housing situation, but for the intangible and nonquantifiable injury to his or her psyche suffered as a result of the respondent's unlawful acts, in the manner of a traditional private tort action in a court of law. (Cf. *Peralta, supra,* 52 Cal.3d at p. 49; see also Schwemm, *supra,* 16 Harv. C.R.-C.L. L.Rev. at pp. 89-90 [federal housing discrimination claims sound in tort and damage awards should be governed by compensation principles applicable to tort law].) As we stated in *Peralta, supra,* "[t]his effect, we believe, is beyond the scope of the Legislature's intended purpose in enacting the FEHA to prevent and eliminate discrimination . . . ." (52 Cal.3d at p. 49.)

The commission, however, argues that a distinction exists between the performance of a judicial function, on the one hand, and the exercise of judicial power, on the other, and that the state Constitution does not preclude the vesting of "court-like" functions in an administrative agency, so long as

the judicial power of review remains in the courts. As a general proposition, we accepted this argument in *McHugh, supra,* 49 Cal.3d at pages 372-373. From this, however, the commission argues that because its award of general compensatory damages is not a final judgment, but is enforceable only in the superior court and subject to judicial review by way of administrative mandamus (§§ 11523, 12987; Code Civ. Proc., § 1094.5; see also § 12981, subd. (d)), its award is not an unconstitutional exercise of judicial power. In effect, the commission would have us find that satisfaction of the procedural prong of the *McHugh* standard—the "principle of check" (see 49 Cal.3d at pp. 374, 376)—is sufficient to meet a judicial powers challenge to an agency's administrative adjudications.

In support of its argument, the commission cites numerous out-of-state cases that hold the administrative award of unlimited nonquantifiable damages is permissible when, as here, due process procedural rights have been protected, prohibited conduct has been well defined by the governing statute, and judicial review is available. (E.g., *Kentucky Com'n on Human Rights* v. *Fraser, supra,* 625 S.W.2d 852; *Plasti-Line, Inc.* v. *Human Rights Com'n* (Tenn. 1988) 746 S.W.2d 691.) In many of the cited cases, however, the administrative award of unlimited damages for emotional distress type injuries was not at issue. (See, e.g., *Percy Kent Bag Co.* v. *Missouri Com'n,* (Mo. 1982) 632 S.W.2d 480, 483-485 [backpay]; *General Drivers & Helpers U.* v. *Wisconsin Emp. Rel. Bd.* (1963) 21 Wis.2d 242 [124 N.W.2d 123] [vacation pay]; cf. *Zahorian* v. *Russell Fitt Real Estate Agency* (1973) 62 N.J. 399 [301 A.2d 754, 761, 61 A.L.R.3d 927] ["minor or incidental" awards, here $750].) In *McHugh,* moreover, we expressly rejected the proposition that "an administrative agency may exercise all manner of 'judicial-like' power on the simple condition that judicial review of the administrative decision remains available." (49 Cal.3d at p. 364.) Although we recognized that sister states' decisions have occasionally accorded little consideration to the "substantive limitations" principle discussed above (*id.* at p. 371), we adhered to the guiding principles of substantive as well as procedural limitations on the remedial power of administrative agencies (*id.* at p. 374).

In sum, we agree with the Court of Appeal that the commission's award of unlimited general compensatory damages for emotional distress was in violation of the judicial powers clause.[12]

---

[12]We express no opinion concerning the validity of a legislative authorization for the commission in employment cases to award unlimited compensatory damages (cf. § 19702, subd. (e) [State Personnel Board]), or in housing cases to award nominal or minor general compensatory damages not to exceed a specified maximum amount (cf. *Zahorian* v. *Russell Fitt Real Estate Agency, supra,* 301 A.2d 754, 761-762), as these issues are not before us. We

■ The commission's award, by contrast, of damages for Cannon's out-of-pocket expenditures for increased rent and utilities clearly satisfies the *McHugh* standard, as respondents acknowledge. The substantive limitations prong is satisfied because (1) the damages are authorized by the statutory language permitting the award of actual damages (§ 12987); (2) in providing recompense for sums actually expended as a result of the unlawful discrimination, the damages are reasonably necessary to effectuate the commission's statutory purpose of providing effective remedies to eliminate discriminatory practices (§ 12920); and (3) because they are tangible and readily quantifiable, the damages remain incidental to the commission's primary regulatory purposes of preventing and eliminating housing discrimination and making its victim whole in the context of housing. The procedural prong, in turn, is met because the award may be reviewed by petition for a writ of mandamus (§§ 11523, 12987) and is enforceable only by judgment and order of the court (§ 12981, subd. (d)).

■ Although the Court of Appeal construed the statute as authorizing the award of unlimited compensatory damages, and held that the $50,000 compensatory damages award in this case was unconstitutional, it did not invalidate the damages provision of the statute in its entirety; rather, the court determined that the general damages award for emotional distress must be stricken, leaving in effect the special damages award for out-of-pocket loss. Respondents argue that in so doing the Court of Appeal in effect rewrote the statute, which it is not empowered to do (citing *Spiritual Psychic Science Church* v. *City of Azusa* (1985) 39 Cal.3d 501, 520 [217 Cal.Rptr. 225, 703 P.2d 1119]). We disagree. Although the statutory phrase "actual damages" is indivisible, it embodies a dual concept: that of nonquantifiable compensatory damages and that of pecuniarily measurable out-of-pocket expenditures; together these two types of damages make up "actual damages" (See Oleck, *supra*, § 12, at pp. 22-23.) The statute thus is one where a single section contains language susceptible of applications, part of which—i.e., the award of general compensatory damages—is invalid. (See 2 Sutherland, Statutory Construction (4th ed. 1986) § 44.18, p. 533.) In such a case, "the statute should be upheld if, after deletion of the invalid [application], a workable statute remains." (*Ibid.*) This type of severability, Sutherland explains, is permissible in jurisdictions which permit limitation of an entire act to its valid applications. "If a court will limit an entire act to its valid applications, a fortiori it will limit a small part of the statute to its valid applications. [Fn. omitted.]" (*Id.* at p. 534.)

likewise express no opinion concerning the validity of a statutory authorization for the administrative imposition of civil penalties. (See *McHugh, supra,* 49 Cal.3d at p. 378 & fn. 45.)

California is such a jurisdiction. (E.g., *Welton* v. *City of Los Angeles* (1976) 18 Cal.3d 497, 505-506 [134 Cal.Rptr. 668, 556 P.2d 1119]; see *San Francisco Unified School Dist.* v. *Johnson* (1971) 3 Cal.3d 937, 955-956 [92 Cal.Rptr. 309, 479 P.2d 669].) Moreover, the severability clause of the act expressly provides that if any clause or part is adjudged invalid in its application, such judgment shall not invalidate its application to other circumstances, but shall be confined to the circumstances involved. (§ 12996.)[13] Although the severability provision refers only to the employment part of the act, we take this not as an implied expression of legislative intent to exclude the housing provisions, but as merely an oversight when the provisions of the FEPA (former Lab. Code, § 1410 et seq.; see Stats. 1959, ch. 121, § 1, p. 1999 et seq.), including its severability clause (former Lab. Code, § 1432; Stats. 1959, ch. 121, § 1, p. 2005), were combined with the Rumford Fair Housing Act (former Health & Saf. Code, § 35700 et seq.; Stats. 1963, ch. 1853, § 2, p. 3823 et seq.) and its severability clause (Stats. 1963, ch. 1853, § 5, p. 3830) to form the act.

 A severability clause, although not conclusive, " ' "normally calls for sustaining the valid part of the enactment . . . . The final determination depends on whether 'the remainder . . . is complete in itself and would have been adopted by the legislative body had the latter foreseen the partial invalidation of the statute' [citation] . . . ." ' " (*Metromedia, Inc.* v. *City of San Diego* (1982) 32 Cal.3d 180, 190 [185 Cal.Rptr. 260, 649 P.2d 902].) These criteria are clearly met in the instant case: the valid application of the damages provision is complete in itself, and the Legislature, we have no doubt, would have authorized the commission to award only restitutive damages had it foreseen the invalidity of the provision for the award of unlimited compensatory damages.

We therefore hold that section 12987 is valid insofar as it authorizes the commission to award quantifiable out-of-pocket restitutive damages and is invalid under the judicial powers clause insofar as it authorizes the award of nonquantifiable general compensatory damages for emotional distress and other intangible injury.

## B. *The Award of Punitive Damages*

The commission, one commissioner dissenting, awarded Cannon $40,635 in punitive damages, or the statutory maximum of $1,000 for each discrim-

---

[13]Section 12996 provides: "If any clause, sentence, paragraph, or part of this part relating to discrimination in employment or the application thereof to any person or circumstance, shall, for any reason, be adjudged by a court of competent jurisdiction to be invalid, such judgment shall not affect, impair, or invalidate the remainder of this part and the application thereof to other persons or circumstances, but shall be confined in its operation to the clause, sentence, paragraph, or part thereof directly involved in the controversy in which such judgment shall have been rendered and to the person or circumstances involved."

inatory act as determined by the commission, adjusted in accordance with the consumer price index base year of 1982. The superior court reduced the punitive damage award to the statutory limit of $1,000 as adjusted, ruling that the statute prohibits a "course of conduct." The Court of Appeal reversed. The court held that the statute authorizes a separate punitive damage award for each discriminatory act against an individual complainant, equated in this case to every rental by Manor to a non-Black applicant who applied after Cannon while he remained on the waiting list—or some 35 violations as found by the commission.

Section 12987, as amended in 1981, authorizes the commission, on finding a respondent "has engaged in any unlawful practice as defined in this part," to order "[t]he payment of punitive damages in an amount not to exceed one thousand dollars" as adjusted in accordance with the consumer price index. (Stats. 1981, ch. 899, § 3, p. 3424.) ▐ In determining the meaning of the section, we are guided by the following established principles: "[O]ur first task in construing a statute is to ascertain the intent of the Legislature so as to effectuate the purpose of the law. In determining such intent, a court must look first to the words of the statute themselves, giving to the language its usual, ordinary import . . . . The words of the statute must be construed in context, keeping in mind the statutory purpose, and statutes or statutory sections relating to the same subject must be harmonized, both internally and with each other, to the extent possible. [Citations.] Where uncertainty exists consideration should be given to the consequences that will flow from a particular interpretation. [Citation.] Both the legislative history of the statute and the wider historical circumstances of its enactment may be considered in ascertaining the legislative intent. [Citation.] A statute should be construed whenever possible so as to preserve its constitutionality. [Citations.]" (Dyna-Med, supra, 43 Cal.3d at pp. 1386-1387.)

▐ We turn, then, to the statutory language. The statute declares the "practice of discrimination because of race, color," and other specified grounds to be against public policy (§ 12920, par. 3) and states the purposes of the act to be the prevention and elimination of such discriminatory practices (§§ 12920, par. 4, 12980, par. 1). Section 12955 specifies the "unlawful practices" that are in violation of the act. Those applicable to this case include section 12955, subdivision (a), "For the owner of any housing accommodation to discriminate against any person because of the race . . . of such person," and subdivision (d), "For any person subject to the provisions of Section 51 of the Civil Code [guaranteeing equal accommodations in business establishments], as that section applies to housing accommodations, . . . to discriminate against any person because of race . . . ."

"Discrimination" is defined in section 12927, subdivision (c) as including a refusal to rent, and the representation, contrary to fact, that a housing accommodation is not available. Upon a finding of any "unlawful practice," the commission, as seen, may order the payment of $1,000 in punitive damages. (§ 12987, subd. (2).)

Although the statute lists unlawful practices, nowhere does it define "practice." The term, however, is unambiguous. As both lay and legal dictionaries state, the term "practice" means a course of conduct, i.e., "to do or perform often, customarily, or habitually; to make a practice of" (Webster's New Internat. Dict., *supra*, at p. 1937, col. 3); "[r]epeated or customary action; habitual performance; a succession of acts of similar kind; custom; usage" (Black's Law Dict., *supra*, at p. 1172, col. 1). Given this plain meaning of the term, we conclude that in refusing to rent to Cannon on the basis of race, respondents committed a single "unlawful practice" within the meaning of the statute.

Asserting the remedial section of the act was patterned after federal law, the commission maintains we should adopt the federal definition of "discriminatory housing practice" to mean "an act" that is unlawful under the federal law. (42 U.S.C. § 3602(f).) But the federal definition merely applies to permit any person aggrieved by a discriminatory practice (or act) to file a complaint (*id.*, § 3610(a)); before the statute's amendment in 1988 (see fn. 11, *ante*), if the matter was not settled and a civil action ensued, the court was authorized to award the plaintiff no more than $1,000 in punitive damages, regardless of the number of discriminatory acts perpetrated by the respondent. (42 U.S.C., former § 3612(c); see *Fountila* v. *Carter* (9th Cir. 1978) 571 F.2d 487, 494; *Steele* v. *Title Realty Company*, *supra*, 478 F.2d 380, 384.) Although the 1988 amendments revised the remedy provision, allowing administrative as well as judicial relief and increasing the penalties allowed, the federal statute still contemplates that only one penalty will be imposed on the respondent regardless of the number of "acts constituting the discriminatory housing practice that is the object of the charge." (42 U.S.C. § 3612(g)(3).)

California law is the same. Our conclusion that respondents are liable for only one punitive damages award does not mean that a single "act" of discrimination is not a violation of the act or cannot support an accusation and finding of an "unlawful practice." The case law is to the contrary. (See *Stearns*, *supra*, 6 Cal.3d 205, 212-213; *Hess* v. *Fair Employment & Housing Com.*, *supra*, 138 Cal.App.3d 232; see also § 12955, subd. (g) [equating unlawful "acts" and "practices"].) In every case the issue simply is whether the act or acts complained of suffice to show a discriminatory practice in

violation of the statute. (See, e.g., *Stearns, supra*, at p. 212; *Hess, supra*, at pp. 234-235; *Dept. Fair Empl. & Hous.* v. *Davis Realty Co., supra*, FEHC Dec. No. 87-02, CEB 5, at pp. 17-20].) We merely hold that, for the purposes of the authorized remedies, multiple acts of discrimination against the same complainant on the same unlawful basis establish only one unlawful practice.

Thus, in the instant case, Indridson's refusal to rent to Cannon because of his race constituted one violation of the act or one "unlawful practice." (§ 12955, subd. (a).) Each discriminatory act in furtherance of the refusal to rent serves merely as proof of the alleged practice. (See *Stearns, supra*, 6 Cal.3d at p. 212; *Hess* v. *Fair Employment & Housing Com., supra*, 138 Cal.App.3d at pp. 234-235.) Indeed, the commission in its findings stated that "*The most powerful evidence* of Indridson's discriminatory treatment of Cannon is her persistent rental of apartments for which Cannon was eligible to later, non-Black applicants." (Italics added.) Had Indridson, as the department alleged, also discriminated against Cannon on grounds of marital status (i.e., because he was single), such discrimination would have constituted a separate violation of the act (§ 12955, subd. (a)), permitting a separate award of punitive damages. (Cf. *Dept. Fair Empl. & Hous.* v. *Atlantic North Apartments* (1983) No. 83-12, FEHC Precedential Decs. 1982-1983, CEB 13, pp. 4, 11 [two violations]; *Dept. Fair Empl. & Hous.* v. *Davis Realty Co., supra*, FEHC Dec. No. 87-02, CEB 5, pp. 17, 20 [three violations]; *Dept. Fair Empl. & Hous.* v. *Green* (1986) No. 86-07, FEHC Precedential Decs. 1986-1987, CEB 1, pp. 8-11 [six violations].) Similarly, had respondents violated any of the other provisions of section 12955, e.g., advertising a preference for Caucasian tenants (§ 12955, subd. (c)), this practice would likewise justify a separate punitive damages award.

Our adherence to the plain meaning of the statute is consistent with the other tenets of statutory construction previously recited. As discussed in part II.A. of this opinion (*ante*, at pp. 259-262), the history of the housing provisions of the act discloses a legislative intent to provide an inexpensive, streamlined remedy, providing conciliation and corrective, make-whole relief, as an alternative to the more cumbersome and expensive procedures of a civil suit. Pursuant to the statutory scheme, the department from the very outset seeks cooperative resolution of the complaint. (See §§ 12980, subds. (a), (c), 12963.7.) Only if that fails or is inappropriate, does a hearing ensue. (§ 12981, subds. (a), (b).) If, after hearing, the commission finds a violation of the act, it is authorized to order various kinds of primarily equitable and make-whole relief: e.g., a cease and desist order, the provision of the same or like housing, if available (or the provision of financing if financial assistance was denied), the payment of out-of-pocket expenses, and "[a]ffirmative or

prospective relief." (§ 12987, subds. (1), (2), (3).) Whereas the award of limited punitive damages is in keeping with the overall remedial thrust of the act, the award of substantial cumulative punitive damages, as in this case, would be disproportionately punitive and sharply at odds therewith. ▮ Unlike the primarily equitable and corrective remedies authorized by section 12987, "[p]unitive damages . . . are neither equitable nor corrective; punitive damages serve but one purpose—to punish and through punishment, to deter." (*Dyna-Med, supra*, 43 Cal.3d at p. 1387.)

▮ "The general rule is that '[w]here the enabling statute is essentially remedial, and does not carry a penal program declaring certain practices to be crimes or provide penalties or fines in vindication of public rights, an agency does not have discretion to devise punitive measures such as the prescription of penalties or fines.' " (*Dyna-Med, supra*, 43 Cal.3d at p.1388.) ▮ Here, although the enabling statute authorizes the award of limited punitive damages, the statute is essentially remedial. To construe it, as the commission urges, as permitting unlimited multiple cumulative awards of punitive damages, would be to alter fundamentally the nature of the administrative remedy. "Uniformly, we have looked with disfavor on ever-mounting penalties and have narrowly construed the statutes which either require or permit them." (*Hale* v. *Morgan, supra*, 22 Cal.3d 388, 401.)

▮ Finally, a statute is to be construed whenever possible so as to preserve its constitutionality. (*Dyna-Med, supra*, 43 Cal.3d at p. 1387 and cases cited.) ▮ Under the commission's view, a question would arise whether the administrative award of substantial punitive damages by a nonconstitutional agency, as here, would violate the judicial powers clause. Although in *McHugh, supra*, 49 Cal.3d 348, we expressly noted we were not considering the constitutional propriety of "relatively minor 'punitive damages' under statutory schemes that expressly authorize such damages, and set a cap on such awards," citing section 12987 (49 Cal.3d at p. 378 & fn. 46), the decision nevertheless is significant for present purposes. First, it characterizes section 12987 as imposing "relatively minor" punitive damages and setting a "cap" on such damages. The strong implication is that a statute authorizing the administrative award of major or substantial punitive damages, with no cap on the cumulative amount, would be constitutionally suspect. Second, pursuant to the principles set forth in *McHugh* and discussed in part II.A. of this opinion (*ante*, at p. 256), we would have difficulty in characterizing a several thousand dollar punitive damages award as "merely incidental" relief, necessary to effectuate the remedial purposes of the statute. Further, like the treble damages provision we struck in *McHugh*,

the power to award multiple, cumulative punitive damages for multiple acts of discrimination comprising a single course of conduct against a single individual "poses a risk of producing arbitrary, disproportionate results that magnify, beyond acceptable risks, the possibility of arbitrariness inherent in any scheme of administrative adjudication." (49 Cal.3d at p. 379.)

The commission urges that cumulative punitive damages effectuate the purpose of the law by serving to deter repeated acts of discrimination. We do not dispute the deterrent effect of punitive damages. (See *Dyna-Med, supra,* 43 Cal.3d at p. 1389.) In light, however, of the considerations discussed above, this is insufficient basis to construe the statute as authorizing such awards.

In *People v. Superior Court* (1973) 9 Cal.3d 283 [107 Cal.Rptr. 192, 507 P.2d 1400, 55 A.L.R.3d 191], this court reached a similar conclusion in construing consumer protection legislation prohibiting false and misleading advertising (Bus. & Prof. Code, § 17500 et seq.). There, the Attorney General filed a civil action against several door-to-door encyclopedia sales-men. The complaint alleged that each defendant made various specified misrepresentations to each customer solicited, in violation of Business and Professions Code section 17500.[14] Pursuant to Business and Professions Code section 17536,[15] the complaint sought an award of $2,500 in civil penalties for each "act" of false or misleading advertising. (9 Cal.3d at p. 286.) This court held that the amount of civil penalties that could be imposed was dependent upon the number of "violations" a defendant com-mitted. (*Id.* at p. 288.) The Attorney General, in an argument strikingly similar to the argument the commission makes here, maintained that each misrepresentation by a defendant constituted a separate violation subject to a separate penalty. Rejecting the argument, we held that "the number of violations is to be determined by the number of persons to whom the misrepresentations were made, and not by the number of separately identi-fiable misrepresentations involved. Thus, regardless of how many misrepre-sentations were allegedly made to any one potential customer, the penalty may not exceed $2,500 for each customer solicited by a defendant." (*Id.* at p. 289.)

---

[14]Business and Professions Code section 17500 provides in pertinent part: "It is unlawful for any person, firm, corporation or association, or any employee thereof with intent directly or indirectly to dispose of real or personal property or to perform services, . . . or to induce the public to enter into any obligation relating thereto, to make or disseminate . . . any statement, concerning such real or personal property or services, . . . which is untrue or misleading, . . ."

[15]Business and Professions Code section 17536 provides in pertinent part: "(a) Any person who violates any provision of this chapter shall be liable for a civil penalty not to exceed two thousand five hundred dollars ($2,500) for each violation, . . ."

In reaching this conclusion, we recognized that the intent of Business and Professions Code section 17536 was "to strengthen the hand of the Attorney General in seeking redress for violations of [Business and Professions Code] section 17500," since the injunction and misdemeanor provisions of the old law had proven inadequate to stop "false advertising rackets." (*People* v. *Superior Court, supra,* 9 Cal.3d at pp. 288-289 & fn. 3.) Nevertheless, "it is unreasonable," we reasoned, "to assume that the Legislature intended to impose a penalty of this magnitude for the solicitation of one potential customer." (*Id.* at p. 289.)

We are not unmindful of the substantial deleterious effects of housing discrimination, not only on the individual victim, but on society at large. Without in any way diminishing the gravity of such discrimination or minimizing the particularly egregious violations of law that occurred in this case, we nevertheless believe that here, as in *People* v. *Superior Court, supra,* 9 Cal.3d 283, it would be unreasonable to assume that the Legislature, in an essentially remedial statute, intended to authorize the commission to impose substantial multiple, cumulative punitive damage awards for a single course of discriminatory conduct against one complainant.

## CONCLUSION

The judgment of the Court of Appeal is reversed in part and affirmed in part. That part of the Court of Appeal judgment relating to punitive damages is reversed. That part of the Court of Appeal judgment relating to emotional distress compensatory damages is modified with directions to order the superior court to modify its writ to strike the award of compensatory damages for emotional distress[14] and, as modified, is affirmed.

Lucas, C. J., Mosk, J., Arabian, J., and Baxter, J., concurred.

**KENNARD, J.**—I dissent.

Through the Fair Employment and Housing Act[1] (FEHA or the Act), this state has made a firm commitment to eradicate housing discrimination on the basis of race, color, religion, sex, marital status, national origin, or ancestry. (§ 12920.) To achieve this difficult and worthy goal, our statutory scheme authorizes the Fair Employment and Housing Commission (Commission), upon proof of unlawful housing discrimination forbidden by the Act, to

[14]The Court of Appeal judgment omitted an order directing the superior court to strike the compensatory damages award for emotional distress. Our modification corrects that omission.

[1]Government Code section 12900 et seq.; all further statutory references are to this code unless otherwise stated.

award damages to the victims of that discrimination. The damages the Commission may award include compensatory damages for emotional suffering, and punitive damages in an amount not to exceed $1,000 (plus an inflation adjustment) for any practice that violates the Act.

The majority holds that administrative awards of compensatory damages for emotional suffering violate our state Constitution's judicial powers clause, and that the Act itself limits administrative awards of punitive damages to $1,000 from each violator of the Act for multiple acts of discrimination of the same type against a single victim. These holdings, as I shall explain, are neither compelled by our state Constitution nor faithful to the language or purpose of the Act. Worse yet, they will so impair the Act's administrative enforcement as to prevent achievement of its paramount goal.

The significance of these holdings can best be appreciated in the context of the facts of this case. In 1979, Robert Cannon, a 55-year-old African-American, applied to rent an apartment at Walnut Creek Manor, a 418-unit apartment complex for persons 55 years and older, in part because he had friends who lived there. Because of his race, Cannon remained on the waiting list for two and one-half years.

In 1982, Cannon met a non-African-American who, after only a few months on the waiting list, had rented an apartment at Walnut Creek Manor. Cannon then realized that his race was the reason no apartment had been offered him, and filed a FEHA complaint. Investigation uncovered that Walnut Creek Manor had rented 35 apartments to non-African-Americans who applied after Cannon.

At the administrative hearing, Cannon testified that as the result of Walnut Creek Manor's refusal to rent to him, he had suffered humiliation and embarrassment. The Commission awarded Cannon $50,000 in compensatory damages for emotional distress and $35,000 in punitive damages ($1,000 for each of the 35 violations of the Act) plus an adjustment for inflation. The majority eliminates the award for emotional distress and reduces the punitive damage award to slightly more than $1,000. I disagree with this result.

The first part of this dissenting opinion shows that the judicial powers clause of the state Constitution does not prevent the Commission from awarding damages for emotional distress. The second part explains that the Legislature has authorized the Commission to award punitive damages up to

the statutory maximum of $1,000 for each separate act of housing discrimination.

## I. The Judicial Powers Clause Does Not Preclude the Commission From Awarding Damages for Emotional Distress Caused by Housing Discrimination

FEHA, like the federal Fair Housing Act (42 U.S.C. §§ 3601-3619), relies primarily on the enforcement efforts of those who have been victimized by housing discrimination. But experience has taught two important lessons about private enforcement in this field. First, private enforcement through the courts will never by itself eliminate housing discrimination because those discriminated against are too often unable or unwilling to undertake the costly and burdensome task of prosecuting a civil lawsuit. For this reason, effective administrative remedies are essential to continued private enforcement of the Act. Second, housing discrimination causes emotional distress that is often severe, but it rarely causes significant out-of-pocket losses.[2] Therefore, an administrative remedy that compensates only for financial losses, and not for emotional distress, will not provide the incentive that discrimination victims need to vigorously prosecute their administrative remedies.

The inescapable conclusion to be drawn is that a system that relies on private enforcement, yet bars administrative tribunals from compensating housing discrimination victims for their emotional distress, cannot eliminate housing discrimination. Such a system is doomed to fail. For these reasons, administrative awards of compensatory damages for pain and suffering are

---

[2]This case illustrates the point. Cannon's out-of-pocket loss was $2,724.50, including attorney fees. He did, however, suffer substantial compensable loss in the form of emotional distress. The superior court judge who reviewed the Commission results described its $50,000 compensatory damage award to Cannon as "moderate enough for being passed over and, therefore humiliated, as many times as occurred."

The Commission made these findings in support of its award for emotional distress: "[Cannon] felt comfortable with the social and financial level he had achieved. [He] felt confident of his ability to rent an apartment because it was within his financial means and self-perceived social class. He referred to himself as someone who did not try for things 'out of his league' financially or socially because he 'hated to be rejected.' It never occurred to Cannon that he would not get an apartment in the Manor if he were patient and waited his turn. [¶] Being denied housing at the Manor had a profound effect on Cannon's self-esteem and caused him considerable pain, humiliation and embarrassment. The rejection affected his friendships with other residents at Walnut Creek Manor. . . . The rejection also affected Cannon's ability to look for other housing, discouraging him and making him worry that he would be rejected again." Cannon expressed feelings of "pain and bewilderment" at his rejection, "he thought about it at night," and felt "frustrated . . . by the realization that his record as a good tenant and a person who got along with all kinds of people was irrelevant to [getting accepted by Walnut Creek Manor]."

reasonably necessary to effectuate FEHA's primary purpose of eliminating housing discrimination and thus do not violate the judicial powers clause of the California Constitution (art. VI, § 1).

### A. FEHA Authorizes the Commission to Award Emotional Distress Damages to the Victims of Housing Discrimination

Segregated housing patterns, which frequently confine minority groups to substandard housing, persist in many areas in California and throughout the nation. (See Schwemm, *Private Enforcement and the Federal Fair Housing Act* (1988) 6 Yale L. & Pol'y Rev. 375, 384 [hereafter *Private Enforcement and Fair Housing*].) Although low income undoubtedly prevents many minority group members from obtaining better housing, this case vividly demonstrates that discrimination on racial and other grounds continues to prevent individuals from obtaining housing they can well afford, a situation that Congress has recognized to be one of our most serious social problems. As one commentator has written, "The involuntary ghetto is inimical to the American dream." (Kaplan, *Discrimination in California Housing: The Need for Additional Legislation* (1962) 50 Cal.L.Rev. 635, 643 [hereafter *Discrimination in California Housing*].) And, as the United States Supreme Court has recognized, a landlord who discriminates against a rental applicant injures not just the applicant, but the whole community. (*Trafficante* v. *Metropolitan Life Ins.* (1972) 409 U.S. 205, 211 [34 L.Ed.2d 415, 420, 93 S.Ct. 364].)

FEHA declares that "the practice of discrimination because of race, color, religion, sex, marital status, national origin, or ancestry in housing accommodations is . . . against public policy." (§ 12920.) As used in FEHA, the term "housing accommodations" includes virtually all real property intended to be used as a home or residence. (§ 12927, subd. (d).) "Discrimination" includes refusing to sell, rent, or lease; misrepresenting the availability of accommodations; providing segregated housing; and providing inferior terms, facilities, or services. (§ 12927, subd. (c).) FEHA's stated purpose is to "eliminate such discriminatory practices." (§ 12920.)

A person who has suffered housing discrimination can seek redress by filing a verified complaint with the Department of Fair Employment and Housing (Department). (§ 12960.) The Department investigates the complaint and seeks to conciliate the dispute. (§§ 12963, 12963.7.) It then has two options: It may issue "a right-to-sue letter" permitting the complaining party to seek redress in a civil lawsuit (§ 12980, subd. (d)); or, when necessary and appropriate, it may issue an accusatory pleading initiating a

hearing before the Commission (§ 12981). (See *Rojo* v. *Kliger* (1990) 52 Cal.3d 65, 72 [276 Cal.Rptr. 130, 801 P.2d 373].)

If the Department issues an accusation and the Commission concludes after a hearing that the Act has been violated, the Commission must issue "an order requiring [the] respondent to cease and desist" the discriminatory practice. (§ 12987.) In addition, the Commission may take whatever other steps it deems necessary to achieve the Act's stated goal of eliminating housing discrimination. These additional steps include requiring the respondent to sell or rent the housing (or comparable housing) to the complainant, and awarding the complainant "actual damages." (*Ibid.*) As the majority acknowledges (maj. opn., *ante*, p. 255), the term "actual damages" includes damages for emotional suffering. In the context of damage awards, emotional suffering includes mortification, humiliation, indignity, grief, anxiety, and worry. (*Thing* v. *La Chusa* (1989) 48 Cal.3d 644, 648-649 [257 Cal.Rptr. 865, 771 P.2d 814].) The constitutional validity of the legislative authorization for the Commission to award emotional distress damages is one of the two issues presented by this case.

### B. *Congress Has Recognized the Necessity of Effective Administrative Remedies for Housing Discrimination*

An administrative tribunal's ability to compensate discrimination victims with meaningful damage awards is crucial to eliminating discrimination in housing. This is demonstrated by the history of FEHA's federal counterpart, the Fair Housing Act, and by the congressional findings supporting recent amendments of that legislation.

The federal Fair Housing Act is similar in both purpose and content to FEHA.[3] Like FEHA, the federal law depends on private enforcement to achieve its policy goals. (See *Private Enforcement and Fair Housing, supra,* 6 Yale L. & Pol'y Rev. 375, 378.) The United States Supreme Court has observed that "complaints by private persons are the primary method of obtaining compliance with the [Fair Housing] Act." (*Trafficante* v. *Metropolitan Life Ins., supra,* 409 U.S. 205, 209 [34 L.Ed.2d 415, 419].) When the victims of housing discrimination enforce the fair housing laws, they "act not only on their own behalf but also 'as private attorneys general in

---

[3]Indeed, FEHA bears more than a passing resemblance to the federal act. The Secretary of the federal Department of Housing and Urban Development (HUD) must identify those state and local programs that approximate the federal Fair Housing Act, and has certified FEHA "as substantially similar to the rights and remedies provided under the federal Act." (52 Fed.Reg. 81 (Apr. 28, 1987) pp. 15304-15305.)

vindicating a policy that Congress considered to be of the highest priority.' " (*Id.* at p. 211 [34 L.Ed.2d at p. 420].)

Private enforcement of the federal Fair Housing Act has been frustrated, however, by the difficulty of pursuing court actions. As one commentator notes: "[T]he prospect of hiring a lawyer and filing a lawsuit is not appealing to many people, and this problem is especially acute in the housing field. The very fact that an individual or a family is in the market for new housing often means that their lives are in a state of flux," which frequently makes bringing a civil lawsuit "a practical impossibility." (*Private Enforcement and Fair Housing, supra,* 6 Yale L. & Pol'y Rev. at p. 380.) Other commentators agree that allowing victims of housing discrimination to bring court actions cannot alone eradicate discriminatory housing practices. (*Discrimination in California Housing, supra,* 50 Cal.L.Rev. 635, 642, fn. 42 ["Given the expenses emanating from a lengthy trial, the doubt as to the outcome, immediate need for housing, and the difficulty in calculating damages, many victims of [housing] discrimination may not (or cannot) initiate court action."].)

Compared to a court action, an administrative proceeding is simple to initiate. There are no complex procedural requirements that would require the complainant to seek out and retain private counsel. And administrative proceedings usually produce decisions and remedies more quickly than judicial proceedings.

For administrative proceedings to be truly effective, however, they must offer meaningful compensation to the claimant. The federal experience shows that the single most important component of an effective fair housing program is the administrative agency's enforcement authority. If that authority is weak, the statutory scheme will not succeed.

As originally enacted, the federal Fair Housing Act offered no effective administrative redress of private claims because the powers of HUD, the administrative agency charged with enforcing the federal law, were limited to "informal methods of conference, conciliation, and persuasion." (Former 42 U.S.C. § 3610(a); Pub.L. No. 90-284 (Apr. 11, 1968) tit. VIII, § 810, 82 Stat. 85.) A victim of housing discrimination could obtain equitable relief and money damages only by prevailing in a civil lawsuit. The limitation on HUD's enforcement authority was widely criticized because, as noted above, discrimination victims pursue the alternate route of prosecuting a court action too infrequently to make private tort actions an effective method of combating housing discrimination. (See, e.g., Kushner, *An Unfinished Agenda: The Federal Fair Housing Enforcement Effort* (1988) 6 Yale L. &

Pol'y Rev. 348, 354; *Private Enforcement and Fair Housing, supra,* 6 Yale L. & Pol'y Rev. 375, 380.)

Congress acknowledged the validity of these criticisms in 1988. It found that discrimination and segregation in housing remained pervasive 20 years after the federal law was enacted, noting HUD's estimate that 2 million instances of housing discrimination occur each year. (House Rep. of the Judiciary Com. (hereafter House Report), 1988 U.S. Code Cong. & Admin. News, at p. 2176.) Based on this experience, Congress determined that the principal defect in the existing law, which prevented it from achieving the goal of eradicating discrimination in housing, was the absence of an effective administrative enforcement mechanism (*ibid.*), and that an administrative proceeding should be the primary method by which persons aggrieved by discriminatory housing practices obtain redress (*id.* at p. 2200). For the express purpose of providing effective administrative remedies, Congress passed the Fair Housing Amendments Act of 1988. (42 U.S.C. § 3612; House Rep., *supra*, 1988 U.S. Code Cong. & Admin. News, at pp. 2173-2175.)

These amendments added aggressive administrative enforcement capabilities to the fair housing provisions of the federal act. They provide for agency enforcement of private claims before an administrative law judge, who is empowered, upon a finding of housing discrimination, to award appropriate relief *including compensatory damages,*[4] injunctive relief, other equitable relief, and civil penalties of a maximum of $10,000 for a first violation and up to $50,000 for two or more violations within a seven-year period. (42 U.S.C. § 3612(b), (g); House Rep., *supra*, 1988 U.S. Code Cong. & Admin. News, at p. 2198.) The amendments thus reflect the considered judgment of Congress that effective administrative remedies, including the ability to impose damages and penalties in addition to equitable relief, are vital to the elimination of housing discrimination.

---

[4]The federal act authorizes HUD to award "actual damages." (42 U.S.C. § 3612(g)(3).) Under federal regulations, such damages may include "damages caused by humiliation and embarrassment." (24 C.F.R. § 104.910(b)(1).) Recently, the Eleventh Circuit enforced a decision and order by an administrative law judge awarding $40,000 in damages to a husband and wife for the emotional pain they suffered when the owner of a single family residence repudiated a sales contract with them because he learned they were African-American. (*Secretary, HUD on Behalf of Herron* v. *Blackwell* (11th Cir. 1990) 908 F.2d 864, 872.) The court found the award "rational and fully supported by the record." (*Ibid.*) The court cited this testimony by the wife, which is similar to testimony of the claimant in this case: " 'I feel that everything that has been fought for over the last 30 years . . . was a waste of lives, a waste of time on the part of all those people who worked so hard for equal justice. . . . Our lives have been put on hold because we are not allowed to live where we can afford and choose to live.' " (*Id.* at p. 873.)

C. *California Law Has Also Acknowledged That Effective Administrative Remedies Are Essential to Eliminate Housing Discrimination*

The history of California fair housing laws is also instructive. Before 1963, California fair housing laws were criticized for failing to provide any administrative remedy. (*Discrimination in California Housing, supra,* 50 Cal.L.Rev. 635, 642-643.) In that year, and long before the federal government recognized that eliminating housing discrimination hinged on effective administrative enforcement, the California Legislature provided such enforcement. The Rumford Fair Housing Act (former Health & Saf. Code, § 35700 et seq., enacted by Stats. 1963, ch. 1853, §§ 2-4, pp. 3823-3830) authorized the Commission to award damages as an alternative to equitable relief. Subsequent amendments expanded the Commission's authority to award damages by permitting cumulative awards of damages and equitable remedies and by raising the monetary limit on damage awards. (See maj. opn., *ante,* p. 260.)

The Legislature combined the then-separate housing and employment antidiscrimination provisions into FEHA in 1980. From the outset, FEHA has authorized administrative awards of equitable relief and damages. (§ 12987.) One year after enacting FEHA, the Legislature amended it to increase the Commission's authority to award damages by removing the limit on the amount of actual damages. (See maj. opn., *ante,* p. 260.) These repeated expansions of the Commission's power to award actual damages reflect the Legislature's recognition that tough administrative enforcement powers are necessary to eradicate discrimination in housing.

This case illustrates the practical advantages of administrative enforcement. The claimant, Robert Cannon, met with an attorney one time for less than two hours at a cost of $300. It appears Cannon then filed his own FEHA claim, and thereafter has not been represented by counsel either before the Commission or in court. Instead, the Department, after satisfying itself of the validity of Cannon's claim, has prosecuted the action in its own name.

The effectiveness of the administrative remedy will be destroyed, however, if the Commission is deprived of authority to award compensation for nonmonetary injuries. This is because in most housing cases, the "out-of-pocket damages are *de minimis.*" (*Private Enforcement and Fair Housing, supra,* 6 Yale L. & Pol'y Rev. 375, 380.) Even though administrative proceedings are less burdensome to claimants than prosecuting a court case, they do involve a significant investment of time and effort. Unless the

administrative forum can continue to offer meaningful redress, many persons who have clearly suffered invidious discrimination may simply forgo their claims. The Commission's authority to compensate for emotional distress is therefore crucial to effective enforcement. To deny that authority is to frustrate the statutory goal of ensuring that housing applicants in California will have free and equal access to available housing, limited only by their financial means.

### D. *The Judicial Powers Clause Does Not Deprive the Commission of Its Statutory Authority to Compensate Victims of Housing Discrimination for Their Emotional Distress*

The majority concludes that administrative awards of general compensatory damages for pain and suffering are not "reasonably necessary" to effectuate FEHA's primary purpose and thus violate the judicial powers clause of the state Constitution. (Maj. opn., *ante*, p. 265.) The analysis offered in support of this conclusion is fundamentally flawed.

In *McHugh* v. *Santa Monica Rent Control Bd.* (1989) 49 Cal.3d 348, 372-374 [261 Cal.Rptr. 318, 777 P.2d 91], we interpreted our state Constitution's judicial powers clause (Cal. Const., art. VI, § 1) as setting both a procedural and a substantive limitation on an administrative agency's exercise of powers that are constitutionally reserved to the judiciary. Because administrative orders made under FEHA are subject to judicial review, the procedural limitation is not in issue here.[5]

The substantive limitation, as we explained in *McHugh*, prohibits administrative agencies from exercising "judicial-like" powers only when those powers are not "reasonably necessary to effectuate the agency's primary, legitimate regulatory purposes." (*McHugh* v. *Santa Monica Rent Control Bd.*, *supra*, 49 Cal.3d 348, 372, italics omitted.) Thus, so long as administrative awards of damages to compensate individual victims for pain and suffering resulting from discrimination made unlawful by FEHA are "reasonably necessary" to achieve FEHA's primary, legitimate regulatory purpose, such awards do not violate the judicial powers clause.

FEHA's primary and legitimate purpose is the elimination of discriminatory housing practices. As I have shown, FEHA, like its federal counterpart, relies on private enforcement to achieve its policy goal. FEHA includes

---

[5] FEHA administrative determinations are subject to mandamus review (Code Civ. Proc., § 1094.5) and are enforceable only by superior court order, and then only when all avenues of judicial review have been exhausted or the time for such review has lapsed (§ 12973, subd. (b)).

awards of compensatory damages in the administrative arsenal of remedies as an essential means of furthering its statutory objective. Such damages are thus reasonably necessary to effectuate the Act, and therefore do not conflict with the powers that our state Constitution reserves to the judiciary.

In reaching its contrary conclusion, the majority misapprehends FEHA's purpose. It characterizes that purpose as providing "a streamlined and economic procedure for preventing and redressing discrimination in housing as an alternative to the more cumbersome and costly procedure of civil suit." (Maj. opn., *ante*, p. 264.) Certainly, it is important that FEHA's administrative procedure be both "streamlined and economic." But to say, as the majority does, that this is FEHA's primary goal is to mistake its means for its end. An administrative proceeding may be streamlined and economic, and yet be completely ineffective in eliminating discriminatory housing practices. Indeed, this will be the practical effect of the majority's holding.

The majority need not guess at the legislative purpose underlying FEHA; it need only recognize what the Legislature itself has expressed to be FEHA's stated purpose: "to provide effective remedies which will eliminate such discriminatory [housing] practices." (§ 12920.) Because administrative awards that compensate victims of housing discrimination for their emotional distress serve to achieve this goal, they are "reasonably necessary" and thus satisfy the test this court enunciated in *McHugh* v. *Santa Monica Rent Control Bd.*, *supra*, 49 Cal.3d 348.

The majority concedes that "compensatory damages serve to deter discrimination" (maj. opn., *ante*, p. 258), but then concludes that deterring discrimination is not relevant to the issue in this case (*ibid.*). The majority misses the point. Whether compensatory damages serve in any significant way to further FEHA's underlying purpose is precisely the issue; because they do, administrative awards of such damages do not violate the judicial powers clause.

II. FEHA AUTHORIZES THE COMMISSION TO AWARD PUNITIVE DAMAGES UP TO THE STATUTORY MAXIMUM FOR EACH ACT OF HOUSING DISCRIMINATION

The other issue presented by this case is the scope of the Commission's authority to award punitive damages. FEHA authorizes the Commission to order the payment "of punitive damages in an amount not to exceed one thousand dollars," plus an adjustment for inflation, upon a finding that "a respondent has engaged in *any* unlawful practice" as defined by the Act. (§ 12987, subd. (2), italics added.) In this case, the Commission found 35

separate instances in which Walnut Creek Manor's owner and rental manager had violated FEHA by renting to non-African-American applicants while Cannon's application was pending. For these repeated FEHA violations, the Commission awarded Cannon $40,635 in punitive damages, that is, $1,000 for each discriminatory act, plus an adjustment for inflation. The majority has limited that award to $1,000 plus the inflation adjustment, reasoning that the term "unlawful practice" as used in the statute denotes an entire course of any one form of discriminatory conduct against one particular victim. I disagree. As used in section 12987, "unlawful practice" means any single act in violation of FEHA.

The controlling issue in interpreting the language of any statute is the intent of the Legislature. (*People* v. *Jeffers* (1987) 43 Cal.3d 984, 993 [239 Cal.Rptr. 886, 741 P.2d 1127]; *Milligan* v. *City of Laguna Beach* (1983) 34 Cal.3d 829, 831 [196 Cal.Rptr. 38, 670 P.2d 1121].) To determine that intent, we look first to the words of the statute, construing them in context, while harmonizing "both internally and with each other, to the extent possible" those statutes or statutory sections that pertain to the same subject matter. (*Dyna-Med, Inc.* v. *Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1386-1387 [241 Cal.Rptr. 67, 743 P.2d 1323].)

Viewed in isolation, the language of section 12987 is ambiguous on the point at issue. The statute does not expressly provide that the punitive damage limit applies to each distinct act of discrimination, to each separate form of discrimination, or jointly to all discriminatory acts of whatever form. The meaning of ambiguous statutory language should be "determined with reference to whole system of law of which it is a part . . . ." (*Travelers Indemnity Co.* v. *Gillespie* (1990) 50 Cal.3d 82, 99-100 [266 Cal.Rptr. 117, 785 P.2d 500].) Therefore, to ascertain the Legislature's intent, I look first to FEHA's other provisions.

The term "unlawful practice" appears in two sections of FEHA in addition to section 12987. Section 12960 authorizes persons who claim to be aggrieved by an alleged "unlawful practice" to file a verified complaint with the Department, while section 12965, subdivision (a) states that if efforts at conciliation and persuasion fail to eliminate the "unlawful practice," the Department can file an accusation. The statutory scheme is best harmonized by interpreting the term "unlawful practice" as having the same meaning in all three instances. As the majority acknowledges, a single act of discrimination will support the filing of either a complaint under section 12960 or a Department accusation under section 12965. (Maj. opn., *ante*, p. 269.) Thus, the term "unlawful practice" in section 12987 should be similarly interpreted

as meaning any single act of discrimination. In this way, each "unlawful practice" sufficient to justify a complaint or accusation also justifies a punitive damage award up to the statutory limit.

In interpreting any statute, "[t]he object to be achieved and the evil to be prevented are prime considerations in determining legislative intent." (*People* v. *Jeffers, supra,* 43 Cal.3d 984, 997, citing *Judson Steel Corp.* v. *Workers' Comp. Appeals Bd.* (1978) 22 Cal.3d 658, 669 [150 Cal.Rptr. 250, 586 P.2d 564].) A court should arrive at an interpretation that promotes the general purpose and policy of the law, not one that defeats it. (*Harry Carian Sales* v. *Agricultural Labor Relations Bd.* (1985) 39 Cal.3d 209, 223 [216 Cal.Rptr. 688, 703 P.2d 27], quoting *People* v. *Centr-O-Mart* (1950) 34 Cal.2d 702, 704 [214 P.2d 378].) FEHA itself states that its provisions "shall be construed liberally" to effectuate its purposes. (§ 12993.)

In the housing field, as I have noted, FEHA's purpose is "to provide effective remedies which will eliminate such discriminatory [housing] practices." (§ 12920.) This court must therefore liberally construe any ambiguous provision in the manner that best achieves this objective. In general, punitive damage awards serve "to punish and through punishment, to deter." (*Dyna-Med, Inc.* v. *Fair Employment & Housing Com., supra,* 43 Cal.3d 1379, 1387.) Punitive damage awards serve FEHA's goal of providing effective remedies to eliminate discriminatory housing practices by deterring such practices. The deterrent effect will be greater if the punitive damage limit is applied separately to each discriminatory act, rather than jointly to a succession of such acts. This construction, therefore, best satisfies the legislative command that FEHA's provisions be liberally construed to achieve the Act's objectives.

The majority limits a landlord's potential punitive damage exposure to $1,000 per victim, no matter how many discriminatory acts the landlord commits, so long as the discriminatory acts are of the same type. (Maj. opn., *ante,* p. 270.) This statutory construction means that a landlord who once discriminates against an applicant has little reason not to continue to do so. Here, for example, the Commission found that the landlord had discriminated against Cannon 35 times by renting to more recent applicants, yet the majority limits the Commission to a single $1,000 award of punitive damages, just as if there had been but a single act of discrimination. This $1,000 award is little punishment for a landlord who has committed as many violations of FEHA as occurred here. As the majority interprets it, section 12987 will neither deter repeated acts of housing discrimination nor advance FEHA's statutory objective.

The majority's reading of section 12987 makes the number of victims the dispositive factor in determining the scope of the Commission's authority to award punitive damages. This focus on the number of victims, rather than the culpability of the wrongdoer, is inconsistent with the deterrent purpose of punitive damages. Moreover, an amendment to section 12987 deleting language that linked the $1,000 maximum punitive damage award to "the aggrieved person" is further indication of legislative intent that the availability of such awards not be dependent on the number of victims.

The prior version of section 12987, subdivision (2), authorized the Commission to award "punitive damages to the aggrieved person in an amount not to exceed one thousand dollars." (Former § 12987, subd. (2), added by Stats. 1980, ch. 992, § 4, p. 3162.) In 1981, the Legislature amended subdivision (2) of section 12987, deleting the reference to "the aggrieved person." (Stats. 1981, ch. 899, § 3, p. 3424.) "[A] material change in the phraseology of a legislative enactment is ordinarily viewed as showing an intention on the part of the legislature to change the meaning of the statute." (*McDonough Power Equipment Co.* v. *Superior Court* (1972) 8 Cal.3d 527, 534, fn. 5 [105 Cal.Rptr. 330, 503 P.2d 1338].) The Legislature's deletion of the "aggrieved person" language from section 12987 is one more indication of legislative intent that the statute's $1,000 limit on an administrative award of punitive damages not depend solely on the number of persons aggrieved by the discrimination. This conclusion is also consistent with the Commission's interpretation of section 12987.

In this case, the Commission has interpreted section 12987 to allow an award of punitive damages to a single victim for each wrongful act in violation of FEHA. (See also *Dept. Fair Empl. & Hous.* v. *Green* (1986) No. 86-07, FEHC Precedential Decs. 1986-1987, CEB 1, pp. 12, 14].) Courts give great weight to an agency's construction of a statute it is charged with administering (*Highland Ranch* v. *Agricultural Labor Relations Bd.* (1981) 29 Cal.3d 848, 859 [176 Cal.Rptr. 753, 633 P.2d 949]), and generally will follow that construction "unless it is clearly erroneous" (*San Mateo City School Dist.* v. *Public Employment Relations Bd.* (1983) 33 Cal.3d 850, 856 [191 Cal.Rptr. 800, 663 P.2d 523]). Here, the Commission's construction of the punitive damage limit as applying to each separate discriminatory act is not plainly erroneous and therefore should be followed by this court.

The majority is of the view that its construction of section 12987 is necessary to preserve the constitutionality of the statute because a contrary interpretation would conflict with the judicial powers clause of our state Constitution. (Maj opn., *ante*, p. 271.) I disagree. Administrative punitive damage awards up to the statutory maximum for each separate act of housing

discrimination are reasonably necessary to deter housing discrimination; therefore, they comport with the substantive limitations on administrative exercise of judicial powers. Moreover, as I shall discuss, the majority's treatment of multiple punitive damage awards in relation to the judicial powers clause is fundamentally inconsistent.

In *McHugh* v. *Santa Monica Rent Control Bd.*, *supra*, 49 Cal.3d at pages 378-379, this court relied on the judicial powers clause to strike down a portion of the Santa Monica rent control ordinance that authorized administrative awards of treble damages. We identified section 12987 as a statute that would not violate judicial powers because the punitive damages it authorized were "relatively minor" and it "set a cap on such awards." (*McHugh* v. *Santa Monica Rent Control Bd.*, *supra*, at p. 378 & fn. 46.)

Here, the majority approves multiple punitive damage awards against one landlord, provided each award is payable to a different victim or based on a different form of discrimination. In so doing, the majority necessarily concedes that multiple punitive damage awards made under these circumstances are "relatively minor" and in an amount "capped" by statute, and thus not violative of the judicial powers clause as explicated in *McHugh* v. *Santa Monica Rent Control Bd.*, *supra*, 49 Cal.3d 348. Yet if multiple punitive damage awards to different victims or to the same victim based on different forms of discrimination are constitutional because they are relatively minor and capped by statute, then under the majority's own logic multiple punitive damage awards to the same victim based on multiple acts of the same type of discrimination should be no less offensive to the judicial powers clause. The majority fails to cover this gap in its constitutional reasoning.

In my view, the Commission correctly interpreted section 12987 to authorize an award of up to $1,000 in punitive damages for *each separate act* of housing discrimination.

III. CONCLUSION

The persistence of discriminatory housing practices and the history of state and federal efforts to combat them demonstrate that past remedial measures have not been sufficient and that vigorous administrative enforcement, with meaningful compensatory and punitive damage awards, offers the best available means to ensure a free and nondiscriminatory housing market.

The refusal to provide housing on grounds made unlawful by FEHA is invidious not simply because the applicant is denied housing, but also

because the act of discrimination itself demeans basic human dignity. By stripping the Commission of its statutory authority to compensate the victims of such discrimination for emotional distress—in the name of preserving judicial prerogatives under the state Constitution—and by severely restricting the Commission's statutory authority to punish repeated acts of discrimination with awards of punitive damages, the majority destroys vital components of a carefully structured statutory system, setting that system up to fail.

Broussard, J., concurred.