93 Cal.Rptr.2d 690 (2000)
79 Cal.App.4th 10
Nancy A. KONIG, Plaintiff and Appellant,
v.
FAIR EMPLOYMENT AND HOUSING COMMISSION, Defendant and Appellant.
No. B125249.
Court of Appeal, Second District, Division Two.
March 16, 2000.
Review Granted June 28, 2000.
*691 Nancy Ann Konig, in pro. per., for Plaintiff and Appellant.
Bill Lockyer, Attorney General, Richard M. Frank and Roderick E. Walston, Chief Assistant Attorneys General, Louis Verdugo, Jr., Senior Assistant Attorney General, and Kathleen W. Mikkelson, Deputy Attorney General, for Defendant and Appellant.
Certified For Partial Publication.[*]
MALLANO, J.[**]
The Fair Employment and Housing Commission of the State of California (the Commission) appeals from that portion of a judgment granting Nancy A. Konig's petition for peremptory writ of mandamus, commanding the Commission to set aside its award of emotional distress and lost housing opportunity damages to Sheryl Annette McCoy for Konig's unlawful housing discrimination on the basis of race under the California Fair Employment and Housing Act (Gov.Code, § 12900 et seq.; the Act).[1] We affirm.

I. The Facts
McCoy, an African-American and a police officer, stopped to inquire about renting a unit in a duplex owned by Konig, who is White, after observing a "for rent" sign on the premises. The sign directed McCoy to Konig's front door where a notice was posted. As McCoy was bent over reading the notice, Konig came to the door and stated to McCoy: "Shame on you. What are you doing on my porch? Get off my porch. You're trying to break into my house." McCoy inquired about the rental and Konig responded something to the effect that "You're not here to rent this place. You're here to break in" or "[W]hat are you doing? ... I'm not going to rent to a person like you." Konig slammed the door in McCoy's face.
McCoy, in order to ascertain whether Konig's actions towards her had been racially motivated, asked a police officer colleague, Terrence Smith, also an African-American, to inquire about renting the unit from Konig. When Smith approached Konig, the latter fled into her residence, slammed the door and did not respond to Smith's knocks. Smith left his name, address and telephone number on a piece of paper by slipping it in the mail slot as directed by a notice on the door. Konig never contacted Smith.
About one year later, when the unit was again advertised for rent, the Fair Housing Council of Long Beach sent two "testers," both women, to Konig's residence to inquire. The African-American tester was discouraged from renting the premises by Konig on the grounds it was too large. Further, Konig asked the tester if she had given notice at her present rental. The *692 tester replied that she had not, but that her landlord had waived such notice. Nevertheless, Konig insisted that the tester was not free to leave her present rental because she had not given notice. The tester asked for a rental application but Konig refused to give her one. On the other hand, the White tester was treated with deference, not asked about whether she had given notice to her landlord, and told to telephone Konig if she wished to rent the unit.
McCoy was distraught and humiliated by Konig's insults and rebuff. The event caused McCoy to relive an emotionally scarring episode in her life when, as a six-year-old child, she and her family had been victims of racial discrimination at a restaurant. Both McCoy's mother and her colleague, Smith, noticed the deeply rooted adverse effect that this incident had had on her. McCoy suffered no out-of-pocket loss.

II. The Procedural History
McCoy filed a complaint with the Department of Fair Employment and Housing. In due course, a hearing was held before the Commission and it found that Konig had discriminated against McCoy because of her race. The Commission ordered Konig to cease and desist from such conduct and to pay to McCoy a civil penalty of $10,000 (the maximum amount permitted by law under § 12987, subd. (a)(3)) and $10,000 "as actual damages for complainant Sheryl Annette McCoy's emotional distress and lost housing opportunity"; $1 in nominal damages for lost housing opportunity was included in the $10,000 actual damages award (there is no limit on "actual damages" under § 12987, subd. (a)(4)).
Konig filed a petition for peremptory writ of mandate in superior court contending, in the main, that the Commission's factual determination that she had discriminated against McCoy because of her race was incorrect. Ultimately, the trial court partially granted the petition by striking the $10,000 award for emotional distress and lost housing opportunity on the grounds that the Commission was constitutionally prohibited from making such an award by Walnut Creek Manor v. Fair Employment & Housing Com. (1991) 54 Cal.3d 245, 284 Cal.Rptr. 718, 814 P.2d 704 (Walnut Creek Manor). There, the Supreme Court held that the Act is invalid under the judicial powers clause of the California Constitution, article VI, section 1 ("The judicial power of this State is vested in the Supreme Court, court of appeal, superior courts, and municipal courts ...") "insofar as it authorizes the award of nonquantifiable general compensatory damages for emotional distress and other intangible injury." (Walnut Creek Manor, supra, 54 Cal.3d at p. 267, 284 Cal.Rptr. 718, 814 P.2d 704.)

III. Discussion.

Part A. Konig's Appeal[***]

Part B. The Commission's Appeal
The sole issue facing us in this portion of the appeal is whether the Commission was constitutionally prohibited from making its award for emotional distress and lost housing opportunity. The constitutionality of the imposition of the $10,000 civil penalty is not before us, as Konig did not raise the issue. We also note the court in Walnut Creek Manor "expressed] no opinion concerning the validity of a statutory authorization for the administrative imposition of civil penalties," as that issue was not before it. (Walnut Creek Manor, supra, 54 Cal.3d at pp. 265-266, fn. 12, 284 Cal.Rptr. 718, 814 P.2d 704.)
The Commission maintains that Walnut Creek Manor's holding prohibiting awards of general compensatory damages for emotional distress and other intangible injury no longer applies because of a subsequent legislative enactment. In particular, the Commission refers to section 12989, subdivision (a), enacted in 1992, *693 which provides that "If an accusation is issued under Section 12981, a complainant, a respondent, or an aggrieved person on whose behalf a complaint is filed may elect, in lieu of an administrative proceeding under Section 12981, to have the claims asserted in the charge adjudicated in a civil action under this part." We disagree with the Commission's assertion that the "opt out" provision of section 12989, subdivision (a) renders Walnut Creek Manor's holding inapplicable in the present case.
In Walnut Creek Manor, supra, the court recognized "the substantial deleterious effects of housing discrimination, not only on the individual victim, but on society at large." (54 Cal.3d at p. 273, 284 Cal.Rptr. 718, 814 P.2d 704.) It also observed that the purpose of the Act was to "provide a streamlined and economic procedure for preventing and redressing discrimination in housing as an alternative to the more cumbersome and costly procedure of a civil suit." (Id. at p. 264, 284 Cal.Rptr. 718, 814 P.2d 704.) In approaching its task"to construe and determine the constitutionality of the damages provision of the act"the court looked for guidance to McHugh v. Santa Monica Rent Control Bd. (1989) 49 Cal.3d 348, 261 Cal. Rptr. 318, 777 P.2d 91 (McHugh). (Walnut Creek Manor, supra, 54 Cal.3d at p. 251, 284 Cal.Rptr. 718, 814 P.2d 704.)
In McHugh, supra, a case which considered whether a local charter amendment authorizing administrative adjudication of excess rent claims and imposition of treble damages was unconstitutional as in violation of the judicial powers clause, the court articulated the following standard: "An administrative agency may constitutionally hold hearings, determine facts, apply the law to those facts, and order reliefincluding certain types of monetary reliefso long as (i) such activities are authorized by statute or legislation and are reasonably necessary to effectuate the administrative agency's primary, legitimate regulatory purposes, and (ii) the `essential' judicial power (i.e., the power to make enforceable, binding judgments) remains ultimately in the courts, through review of agency determinations." (49 Cal.3d at p. 372, 261 Cal.Rptr. 318, 777 P.2d 91, original italics.)
The Walnut Creek Manor, supra, court observed that the question before it "whether an administrative agency's award of general compensatory damages violates the judicial powers clause"had been reserved by McHugh. The court then stated: "[I]n McHugh ..., we clearly set out the approach for resolving the issue. In applying the first or substantive prong of the standard, i.e., the `reasonable necessity/legitimate regulatory purpose' requirements, we first inquire whether the award is authorized by legislation, and is `reasonably necessary to accomplish the administrative agency's regulatory purposes.' [Citation.] Next, we must `closely scrutinize the agency's asserted regulatory purposes in order to ascertain whether the challenged remedial power is merely incidental to a proper, primary regulatory purpose, or whether it is in reality an attempt to transfer determination of traditional common law claims from the courts to a specialized agency whose primary purpose is the processing of such claims.' [Citation.]" (54 Cal.3d at p. 256, 284 Cal.Rptr. 718, 814 P.2d 704, italics added.)
In further defining the issue before it, the Walnut Creek Manor, supra, court stated: "That compensatory damages serve to deter discrimination and compensate its victim for the psychic harm flowing from discrimination is not in dispute, nor is it the issue. Under McHugh ..., the issue, rather, is whether the award of substantial emotional distress compensatory damages is `reasonably necessary' to accomplish the commission's legitimate regulatory purposes and `merely incidental' to its primary regulatory purposes, or in reality transfers to the agency the judicial function of determining traditional common law claims. [Citation.]" (54 Cal.3d at *694 pp. 258-259, 284 Cal.Rptr. 718, 814 P.2d 704.)
The court concluded that the award of damages for out-of-pocket expenditures of the claimant (who also received a $1,000 punitive damages award), clearly met the McHugh standard: The substantive limitations prong was satisfied because (1) the award of such damages was authorized by legislation, (2) an award of such damages was reasonably necessary to effectuate the Commission's statutory purpose of providing effective remedies to eliminate discriminatory practices, and (3) because they are tangible and readily quantifiable, such damages remain incidental to the Commission's primary regulatory purposes of preventing and eliminating housing discrimination and making its victim whole in the context of housing. (Walnut Creek Manor, supra, 54 Cal.3d at p. 266, 284 Cal. Rptr. 718, 814 P.2d 704.)
However, in connection with the $50,000 award to the claimant "in compensatory damages for emotional distress," the court held that the Act is "invalid under the judicial powers clause insofar as it authorizes the award of nonquantifiable general compensatory damages for emotional distress and other intangible injury." (Walnut Creek Manor, supra, 54 Cal.3d at pp. 253, 266-267, 284 Cal.Rptr. 718, 814 P.2d 704.) An award of such damages "is neither necessary to [the] purpose [of the Act] nor merely incidental thereto; its effect, rather, is to shift the remedial focus of the administrative hearing from affirmative actions designed to redress the particular instance of unlawful housing discrimination and prevent its recurrence, to compensating the injured party not just for the tangible detriment to his or her housing situation, but for the intangible and nonquantifiable injury to his or her psyche suffered as a result of the respondent's unlawful acts, in the manner of a traditional private tort action in a court of law." (Id. at p. 264, 284 Cal.Rptr. 718, 814 P.2d 704.)
The Commission, in contending that the 1992 "opt-out" legislation (§ 12989, subd. (a)) renders Walnut Creek Manor no longer controlling, relies heavily on the case of Commodity Futures Trading Comm'n v. Schor (1986) 478 U.S. 833, 106 S.Ct. 3245, 92 L.Ed.2d 675 (CFTC), a case predating Walnut Creek Manor and McHugh. In CFTC, the United States Supreme Court held that a grant of authority to the CFTC by Congress under the Commodity Exchange Act (7 U.S.C. § 1 et seq.; CEA), allowing the CFTC to adjudicate counterclaims to complaints brought before the CFTC against professional commodity brokers by their customers for violations of the CEA or CFTC regulations, did not violate article III, section 1 of the United States Constitution (the "judicial Power of the United States shall be vested in one supreme Court and in such inferior Courts as the Congress may from time to time ordain and establish"). (CFTC, supra, 478 U.S. at p. 847,106 S.Ct. 3245.)
In the counterclaim at issue in CFTC, a commodity futures broker sought to recover the debit balance of a customer's account. The court concluded that the customer, who had elected to pursue his complaint against the broker for numerous violations of the CEA before the CFTC rather than in federal court, had waived his right to be heard in federal court on the broker's counterclaim. Because the parties had the option of proceeding in federal court, the court declared that "separation of powers concerns are diminished." (CFTC, supra, 478 U.S. at p. 855, 106 S.Ct. 3245.) However, the court made clear that such "waiver" is not dispositive where the separation of powers limitations are involved. The court observed that "our precedents establish that Article III, § 1, not only preserves to litigants their interest in an impartial and independent federal adjudication of claims within the judicial power of the United States, but also serves an `an inseparable element of the constitutional system of checks and balances.' [Citations.] *695 Article III, § 1 safeguards the role of the Judicial Branch in our tripartite system by barring congressional attempts `to transfer jurisdiction [to non-Article III tribunals] for the purpose of emasculating' constitutional courts, [citation] and thereby preventing 'the encroachment or aggrandizement of one branch at the expense of the other.' [Citations.] To the extent that this structural principle is implicated in a given case, the parties cannot by consent cure the constitutional difficulty for the same reason that the parties by consent cannot confer on federal courts subject-matter jurisdiction beyond the limitations imposed by Article III, § 2. [Citation.] When these Article III limitations are at issue, notions of consent and waiver cannot be dispositive because the limitations serve institutional interests that the parties cannot be expected to protect." (CFTC, supra, 478 U.S. at pp. 850-851, 106 S.Ct. 3245, italics added.)
The court concluded that the separation of powers principles were not contravened, stating: "we are persuaded that the congressional authorization of limited CFTC jurisdiction over a narrow class of common law claims as an incident to the CFTC's primary, and unchallenged, adjudicative function does not create a substantial threat to the separation of powers" and that "... [T]he magnitude of any intrusion on the Judicial Branch can only be termed de minimis." (CFTC, supra, 478 U.S. at pp. 854, 856, 106 S.Ct. 3245.)
The Commission argues that we should follow the rationale of CFTC and conclude that there is no infringement on the California judicial powers clause here. Yet the rationale of CFTC does not apply. In CFTC, the United States Supreme Court held that the structural principle which precludes the encroachment or aggrandizement of one branch of government at the expense of the other did not bar the de minimis intrusion on the judicial branch occurring there. By contrast, in Walnut Creek Manor, our state Supreme Court held that the substantive limitations prong described in McHugh prevented our state Legislature from authorizing the Commission to award nonquantifiable general compensatory damages for emotional distress and other intangible injury, stating that the award of such damages "is neither necessary to [the] purpose [of the Act] nor merely incidental thereto; its effect, rather, is to shift the remedial focus of the administrative hearing from affirmative actions designed to redress the particular instance of unlawful housing discrimination and prevent its recurrence, to compensating the injured party not just for the tangible detriment to his or her housing situation, but for the intangible and nonquantifiable injury to his or her psyche suffered as a result of the respondent's unlawful acts, in the manner of a traditional private tort action in a court of law." (Walnut Creek Manor, supra, 54 Cal.3d at p. 264, 284 Cal.Rptr. 718, 814 P.2d 704.) We view the substantive limitations prong examined in Walnut Creek Manor as synonymous with the structural principle discussed in CFTC. The counterclaim at issue in CFTC to recover a readily quantifiable debit balance of a commodity broker's customer's account, described by the court as "an incident to the CFTC's primary, and unchallenged, adjudicative function" (CFTC, supra, 478 U.S. at p. 854, 106 S.Ct. 3245), is fundamentally different than the claim here, one for nonquantifiable general compensatory damages for emotional distress or other intangible injury, which the Walnut Creek Manor court declared to be "neither necessary to [the] purpose [of the Act] nor merely incidental thereto." (Walnut Creek Manor, supra, 54 Cal.3d at p. 264, 284 Cal.Rptr. 718, 814 P.2d 704.)
Moreover, McHugh distinguishes CFTC in discussing the assertion of the plaintiff-landlord in McHugh that because landlords do not submit voluntarily to administrative adjudication, such adjudication is outside the proper scope of agency power. *696 The McHugh court stated: "CFTC, however, is distinguishable. It involved the power of an administrative agency to resolve, in the course of an administrative reparations proceeding between a commodity futures customer and his broker, the broker's common law counterclaim. The power of the agency to adjudicate the underlying reparations claim was unchallenged." (McHugh, supra, 49 Cal.3d at p. 385, fn. 58, 261 Cal.Rptr. 318, 777 P.2d 91, original italics.) The court went on to observe: "Had the CFTC case presented the agency's authority to adjudicate only the [customer's] reparations claim, it appears that the parties' consent to the administrative forum would have been of little or no significance." (Id. at p. 386, fn. 58, 261 Cal.Rptr. 318, 777 P.2d 91.) CFTC recognized that where the structural principle it discussed is implicated, "the parties cannot by consent cure the constitutional difficulty...." (CFTC, supra, 478 U.S. at p. 851, 106 S.Ct. 3245.) Here, unlike CFTC, the structural principle is involved. Accordingly, we conclude that the 1992 "opt-out" legislation does not thwart Walnut Creek Manor's prohibition of damages for emotional distress and other intangible injury.
The Commission in its briefings also urges us, in substance, to reject the holding of Walnut Creek Manor. In support, it cites federal and sister state decisions in which awards of damages for emotional distress made by administrative agencies have been upheld. It even goes so far as citing its own holdings that Walnut Creek Manor is no longer a bar to an award of damages for emotional distress, candidly admitting that it has been making such awards predicated on the 1992 "opt-out" legislation. The Commission passionately condemns the evil of discrimination and its deleterious effect on its victims and society as a whole, all of which Walnut Creek Manor readily acknowledged. It points out the social need for a "streamlined and economical procedure for preventing and redressing discrimination in housing," again something expressly recognized by Walnut Creek Manor. Without the ability to award damages for emotional distress, this procedure will be bypassed and the poor, who cannot afford to prosecute a civil action under the Unruh Civil Rights Act (Civ.Code, § 51 et seq.) will be disadvantaged further, maintains the Commission. Despite whatever merit these arguments may have, they ought to be addressed to our state Supreme Court, as we must follow Walnut Creek Manor. (Auto Equity Sales, Inc. v. Superior Court (1962) 57 Cal.2d 450, 455, 20 Cal.Rptr. 321, 369 P.2d 937.)
Finally, the Commission requests that we remand the matter to the trial court for an award of nominal damages for emotional distress. In Walnut Creek Manor, the court "express[ed] no opinion concerning the validity of a legislative authorization for the commission ... in housing cases to award nominal or minor general compensatory damages not to exceed a specified maximum amount [citation], as [the issue] was not before [it]." (Walnut Creek Manor, supra, 54 Cal.3d at p. 265, fn. 12, 284 Cal.Rptr. 718, 814 P.2d 704.)
We note that in Smith v. Fair Employment & Housing Com. (1996) 12 Cal.4th 1143, 1154, footnote 5, 51 Cal.Rptr.2d 700, 913 P.2d 909, the court vacated a $500 damages award for emotional distress made by the Commission, citing Walnut Creek Manor. In light of the $10,000 civil penalty award to McCoy, and because the Commission has offered no cogent reason in support of its request, we decline to remand the matter to the trial court for an award of nominal damages for emotional distress.

IV Disposition
The judgment is affirmed. Each party is to bear its own costs.
BOREN, P.J., and NOTT, J., concur.
NOTES
[*] Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of Part A of the Discussion.
[**] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.
[1] AH further statutory references are to the Government Code unless otherwise indicated.
[***] See footnote *, ante.